[Crim. No. 10603. In Bank. Dec. 23, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. ROBERT ARTHUR ANDERSON, Defendant and Appellant.

Paul A. Mansfield, under appointment by the Supreme Court, Eugene M. Premo and Marcel B. Poche for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Albert W. Harris, Jr., Assistant Attorney General, and Jerome C. Utz, Deputy Attorney General, for Plaintiff and Respondent.

TOBRINER, J.—Defendant was indicted for the murder of Victoria Hammond, a 10-year-old girl, in 1962. The jury found defendant guilty of first degree murder, found that he was sane, and fixed the penalty at death. This court, in *People* v. *Anderson* (1965) 63 Cal.2d 351 [46 Cal.Rptr. 763, 406 P.2d 43], reversed the judgment both as to conviction and penalty, one of the grounds being that the introduction of defendant's extrajudicial confession violated *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758].

After a second trial, the jury again found defendant guilty of first degree murder, found that he was sane, and fixed the penalty at death. This appeal is automatic. (Pen. Code, § 1239, subd. (b).)

Defendant correctly contends that veniremen were excluded from the jury panel in violation of the standards set forth by the Supreme Court in *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770], and that therefore the death penalty was unconstitutionally imposed. We do not find it necessary to remand the case for a new penalty trial, however, because we conclude that the evidence is insufficient to support a verdict of first degree murder on the theory of either (a) premeditated and deliberate murder, or (b) murder committed during the perpetration or attempted perpetration of a violation of Penal Code section 288.

*The Facts.*

Defendant, a San Jose cab driver, had been living for about eight months with a Mrs. Hammond and her three children, Cynthia, aged 17, Kenneth, aged 13, and the victim, Victoria, aged 10. On the morning of the day of the murder, December 7, 1962, Mrs. Hammond left for work at 7:30 a.m., leaving only Victoria at home with the defendant. Defendant was still in bed. He had been home from work for the previous two days. during which time he had been drinking heavily, and apparently he did not go to work on the day of the murder.

The owner of a nearby liquor store testified that defendant purchased a quart of whiskey from him sometime between 1 and 2 p.m. on December 7, 1962. The only other witness who testified as to defendant's whereabouts that day prior to the discovery of the murder was the victim's 13-year-old brother Kenneth.

Kenneth testified that he arrived home from school at 3:30 p.m. on December 7. He found the front door locked, which was not unusual, so he went around to the back of the house and down to the basement. Kenneth stayed there awhile work-

ing with his microscope. In a short time he heard noise coming from upstairs in the house which sounded like boxes and other things being moved around, like someone was cleaning up. He then heard the shower water running. A police officer later verified that a person in the basement could hear water running in the shower and movement in Victoria's bedroom.

Kenneth testified further that he then came up from the basement and went to the back porch screen door. The screen door was locked, which also was not unusual, so Kenneth jerked on it so the hook would pop out. Kenneth then went from the back porch directly into his bedroom to change his clothes. He then returned through the back porch to the kitchen door which was also locked. Kenneth knocked on the door and the defendant opened it. Kenneth testified that the defendant was wearing slacks only. Kenneth went into the kitchen and asked defendant for $1.00 for a teen club dance he intended to attend that evening. Defendant obtained a dollar for him out of the pocket of another pair of slacks hanging on the knob of a bedroom door. When Kenneth noticed the blood on the kitchen floor and asked defendant about it, the defendant told Kenneth that he had cut himself. This explanation apparently satisfied Kenneth, as he finished dressing and left the house sometime before 4 p.m.

Kenneth testified that no one else was at his house when he was there between 3:30 and 4 p.m. He further testified that about 6:30 he realized that he had forgotten his wallet and returned home. As he approached the front door, his mother came out and asked to see the cut on his arm, and Kenneth explained that he had no cut. His mother than asked defendant about the blood she had noticed and defendant told her that Victoria had cut herself, but that the mother should not worry, as the cut was not serious. After defendant told her that Victoria was at a friend's for dinner, the mother wanted to take Kenneth with her to get Victoria. Kenneth went back to his room to get a jacket. Because he had a ''weird'' feeling, he looked into Victoria's room. He found her nude, bloody body under some boxes and blankets on the floor near her bed. Kenneth ran out of the room screaming that defendant had killed her. Mrs. Hammond, after seeing Victoria's body, went next door to phone the police.

Mrs. Hammond testified that she returned home from work at 4:45 p.m. The front door was locked she rang the doorbell, and defendant answered. Mrs. Hammond noticed blood on the couch in the living room, and when she asked defendant about

it, he told her that Kenneth had cut himself playing with a knife and that he was at a teenage dance. Mrs. Hammond then went to the grocery store and returned about 5:30 p.m. She testified that at both times she arrived home defendant was drinking a highball. She also testified as to examining Kenneth's arm for a cut when he returned home for his wallet and as to defendant's subsequent explanation that Victoria had been cut, but not seriously. Mrs. Hammond discovered Victoria's body after Kenneth came out of Victoria's room.

A classmate of Victoria, who was the last person to see Victoria alive, testified that she left Victoria in front of the Hammond house about 3:45 p.m. after the two of them had walked home from school.

When the police arrived at 7 p.m. the shades were down on all the windows and the doors were locked. Defendant finally opened the front door for one of the officers who arrested and handcuffed defendant. The arresting officer testified that defendant was wearing slacks, no shirt or shoes, and that there was no blood on him.

The arresting officer found Victoria's body on the floor near her bed. He found defendant's blood-spotted shorts on a chair in the living room, and a knife and defendant's socks, with blood encrusted on the soles, in the master bedroom. The evidence established that the victim's torn and bloodstained dress had been ripped from her, that her clothes, including her panties out of which the crotch had been ripped, were found in various rooms of the house, that there were bloody footprints matching the size of the victim's leading from the master bedroom to Victoria's room, and that there was blood in almost every room including the kitchen, the floor of which appeared to have been mopped.

The TV cameraman who covered the murder story for channel 11, the officer who drove defendant to the police station, and the officer who ''observed'' defendant for four hours at the station the night of December 7, 1962, all testified that defendant did not appear intoxicated. The officers who talked to defendant testified, however, that they smelled alcohol on his breath; a blood test taken at 7:45 p.m. indicated that the alcohol content in defendant's blood was .34 percent, which was more than necessary for an automobile driver to be classified as ''under the influence.''

Over 60 wounds, both severe and superficial, were found on

Victoria's body.[1] The cuts extended over her entire body, including one extending from the rectum through the vagina, and the partial cutting off of her tongue. Several of the wounds, including the vaginal lacerations, were post mortem. No evidence of spermatozoa was found in the victim, on her panties, or on the bed next to which she was found.

The prosecution contended that the murder was sexually motivated. The defendant, who pleaded not guilty and not guilty by reason of insanity, presented no defense whatsoever. The court instructed the jury on two theories of first degree murder, premeditated and deliberate murder, and murder committed in the perpetration or attempt to perpetrate an offense under section 288 of the Penal Code; second degree murder; and voluntary and involuntary manslaughter. The court also instructed the jury on diminished capacity due to voluntary intoxication and its relationship to second degree murder and manslaughter. The jury found the defendant guilty of murder in the first degree. Initially, prior to an exposition of our reasons for reducing the judgment to second degree murder, we dispose of defendant's contention that the invalidity of the indictment vitiates the entire proceeding.[2]

1. *The trial court's refusal to allow defendant to withdraw his plea in a case in which defendant had not waived his right to attack the indictment did not constitute an abuse of discretion.*

 Defendant was indicted in 1962. The only evidence presented to the grand jury connecting defendant with the crime was an extrajudicial confession obtained in violation of *Escobedo* v. *Illinois, supra,* 378 U.S. 478. (See *People* v. *Anderson, supra,* 63 Cal.2d 351, at pp. 360-362.) After the reversal of defendant's first conviction and before defendant's second trial, defendant moved to withdraw his plea of not guilty to enable him to move to set aside his indictment under Penal Code section 995. The trial court's denial of defendant's motion did not constitute an abuse of discretion.

. Upon an accused's timely motion, an indictment must be set aside if the sole proof of guilt consists of legally incompetent evidence. Section 996 of the Penal Code expressly provides that failure to urge such a motion before entry of the

---

[1]The deputy coroner and the funeral director testified as to the condition of the body. The doctor who performed the autopsy did not testify, and the autopsy report was not introduced into evidence.

[2]We do not reach defendant's other contentions since the alleged errors are *prejudicial only* on the question whether defendant was guilty of first or second degree murder and not on the question of guilt or innocence.

plea thereafter precludes an accused from attacking the sufficiency of the evidence presented to the grand jury. Section 996 does not express an absolute mandate, however, and cases may arise in which a defendant may properly attack his indictment for the first time on appeal. Section 996, like the general rule that errors not objected to at trial cannot be raised on appeal, rests upon waiver. Thus, if the circumstances do not show a waiver, a defendant may challenge the indictment on appeal even though he did not raise the point by a motion under Penal Code section 995.

Here, the ground upon which defendant could have challenged the indictment (that evidence was submitted to the grand jury in violation of *Escobedo*) could not have been known by the defendant at the time of the entry of the plea. Insofar as his *first* trial and appeal therefrom are concerned, therefore, defendant did not waive his right to object to the evidence supporting the indictment. Defendant, however, attacked the indictment for the first time after a first trial which resulted in a conviction and reversal.

In this situation the trial judge was called upon to determine whether to set aside defendant's plea, based on a motion which was urged in relation to a *second* trial. If we were to hold that the judge could not consider evidence properly admitted at the first trial, we would do no more than compel the People to perform the needless formality of obtaining a second indictment. We therefore hold that the trial court's denial of defendant's motion to set aside a plea prior to a second trial does not constitute an abuse of discretion when. as here, the first trial reveals ample legally competent evidence on which a valid re-indictment can be obtained.

2. *The evidence is insufficient to support a verdict of first degree murder.*

We must, in the absence of substantial evidence to support the verdict of first degree murder, reduce the conviction to second degree murder. (*People* v. *Ford* (1966) 65 Cal.2d 41, 51 [52 Cal.Rptr. 228, 416 P.2d 132], cert. den. 385 U.S. 1018 [17 L.Ed.2d 554, 87 S.Ct. 737]; *People* v. *Wolff* (1964) 61 Cal.2d 795, 818-819 [40 Cal.Rptr. 271, 394 P.2d 959]; *People* v. *Holt* (1944) 25 Cal.2d 59, 70 [153 P.2d 21]; Pen. Code, §§ 1181, subd. 6, 1260.)

"The legislative definition of the degrees of murder leaves much to the discretion of the jury in many cases. That discretion, however must have a sound factual basis for its exercise . . . . [A]s is true as to all factual issues resolved by

a jury, the evidence upon which the determination is made is subject to review on the question of its legal sufficiency to support the verdict. . . . [T]he jury is bound, as are we, to apply the standards fixed by law. '. . . It is [the jury's] duty to avoid fanciful theories and unreasonable inferences and not to resort to imagination or suspicion.' [Citation.]'' (*People* v. *Holt, supra,* 25 Cal.2d at pp. 83, 90.) ''Mere conjecture, surmise, or suspicion is not the equivalent of reasonable inference and does not constitute proof.'' (*People* v. *Bender* (1945) 27 Cal.2d 164, 186 [163 P.2d 8].)

In the instant case the court instructed the jury on two possible theories of first degree murder: (1) a wilful, deliberate, and premeditated killing; (2) murder which is committed in the perpetration or attempted perpetration of an act punishable under Penal Code section 288.

Viewing the evidence in a light most favorable to the judgment, the first degree conviction must rest upon the following supporting proof: when Kenneth arrived home from school he found the doors locked, and when the police officers arrived to arrest defendant they found the shades in the front room down; defendant apparently had attempted to clean up the bloodstained kitchen, and had fabricated conflicting explanations of the blood that Kenneth noticed in the kitchen, the blood that Victoria's mother observed in the living room, and Victoria's absence on the evening of the killing; defendant had stabbed Victoria repeatedly and had inflicted a post mortem rectal-vaginal wound; bloodstains were found in several rooms of the house; Victoria's bloodstained and shredded dress was found under her bed next to which her nude body was discovered under a pile of boxes and blankets; Victoria's slip, with the straps torn off, was found under the bed in the master bedroom; the crotch was ripped out of Victoria's bloodsoaked panties; and the only bloodstained clothes of defendant's which were discovered were his socks and his shorts, from which facts the People argue that defendant was almost nude during the attack.

We test this evidence under both of the above theories to determine whether it is sufficient to support conviction for first, rather than second, degree murder.

(a) *The evidence is insufficient to support a finding of premeditation and deliberation.*

It is well established that the brutality of a killing cannot in itself support a finding that the killer acted with premeditation and deliberation. ''If the evidence showed no more than the infliction of multiple acts of violence on the

victim, it would not be sufficient to show that the killing was the result of careful thought and weighing of considerations.'' (*People* v. *Caldwell* (1955) 43 Cal.2d 864, 869 [279 P.2d 539]; see also *People* v. *Tubby* (1949) 34 Cal.2d 72, 78 [207 P.2d 51]; *People* v. *Bender, supra,* 27 Cal.2d 164 at p. 180.) ■ Moreover, although premeditation and deliberation may be shown by circumstantial evidence (*People* v. *Robillard* (1960) 55 Cal.2d 88, 93-96 [10 Cal.Rptr. 167, 358 P.2d 295, 83 A.L.R.2d 1086], overruled on another ground, *People* v. *Morse* (1964) 60 Cal.2d 631, 649 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810]), the People bear the burden of establishing beyond a reasonable doubt that the killing was the result of premeditation and deliberation, and that therefore the killing was first, rather than second, degree murder. (*People* v. *Holt, supra,* 25 Cal.2d 59, at p. 91.)

■ Given the presumption that an unjustified killing of a human being constitutes murder of the second, rather than of the first, degree, and the clear legislative intention to differentiate between first and second degree murder, we must determine in any case of circumstantial evidence whether the proof is such as will furnish a *reasonable foundation* for an inference of premeditation and deliberation (*People* v. *Hillery* (1965) 62 Cal.2d 692, 703 [44 Cal.Rptr. 30, 401 P.2d 382], cert. den. 386 U.S. 938 [17 L.Ed.2d 810, 87 S.Ct. 958], reh. den. 386 U.S. 1000 [18 L.Ed.2d 355, 87 S.Ct. 1310]), or whether it ''leaves only to *conjecture and surmise* the conclusion that defendant either arrived at or carried out the intention to kill as the result of a concurrence of deliberation and premeditation.'' (Italics added.) (*People* v. *Bender, supra,* 27 Cal.2d 164 at p. 179.)

One ''phase of the lack of conceptual consistency [in differentiating between murder of the first and second degrees] is manifest in the varying bases upon which the reviewing courts have predicated exercise of the power to reduce judgments to a lower degree or lesser crime. . . . Regardless of imperfections of academic concept either in the statutory law as enacted or in some of the decisions interpreting it, we are faced with the task of making practical application of that law . . . dividing the offense of murder into two degrees . . . .'' (*People* v. *Holt, supra,* 25 Cal.2d 59, at pp. 88-89.)

Recognizing the need to clarify the difference between the two degrees of murder and the bases upon which a reviewing court may find that the evidence is sufficient to support a verdict of first degree murder, we set forth standards, derived

from the nature of premeditation and deliberation as employed by the Legislature and interpreted by this court, for the kind of evidence which is sufficient to sustain a finding of premeditation and deliberation. We then analyze representative cases, including those which the People argue require an affirmance here. In conclusion we demonstrate, in light of the developed standards and two very similar cases (*People* v. *Granados* (1957) 49 Cal.2d 490 [319 P.2d 346]; *People* v. *Craig* (1957) 49 Cal.2d 313 [316 P.2d 947]) in which this court reduced the judgment from first to second degree murder, that the kind of evidence from which a jury can reasonably infer that an accused wilfully, deliberately, and with premeditation killed his victim within the meaning of Penal Code section 189 is totally lacking here.

As we noted in *People* v. *Bender, supra,* 27 Cal.2d 164, 183, we find no indication that the Legislature intended to give the words "deliberate" and "premeditated" other than their ordinary dictionary meanings. Moreover, we have repeatedly pointed out that the legislative classification of murder into two degrees would be meaningless if "deliberation" and "premeditation" were construed as requiring no more reflection than may be involved in the mere formation of a specific intent to kill. (*People* v. *Wolff, supra,* 61 Cal.2d 795, at p. 821; *People* v. *Caldwell, supra,* 43 Cal.2d 864, at p. 869; *People* v. *Thomas* (1945) 25 Cal.2d 880, 898 [156 P.2d 7].)

Thus we have held that in order for a killing with malice aforethought to be first rather than second degree murder, " '[t]he intent to kill must be . . . formed upon a *pre-existing* reflection,' . . . [and have] been the subject of actual deliberation or *forethought* . . . .'' (*People* v. *Thomas, supra,* 25 Cal.2d at pp. 900-901.) (Italics added.) We have therefore held that "[a] verdict of murder in the first degree . . . [on a theory of a wilful, deliberate, and premeditated killing] is proper only if the slayer killed 'as a result of careful thought and weighing of considerations; as a *deliberate* judgment or plan; carried on cooly and steadily, [especially] according to a *preconceived design.' (People* v. *Bender [supra],* 27 Cal.2d 164. 183.) '' (*People* v. *Caldwell, supra,* 43 Cal.2d 864, at p. 869.)

The type of evidence which this court has found sufficient to sustain a finding of premeditation and deliberation falls into three basic categories: (1) facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing—what may

be characterized as "planning" activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a "motive" to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of "a pre-existing reflection" and "careful thought and weighing of considerations" rather than "mere unconsidered or rash impulse hastily executed" (*People* v. *Thomas, supra,* 25 Cal.2d 880, at pp. 898, 900, 901); (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a "preconceived design" to take his victim's life in a particular way for a "reason" which the jury can reasonably infer from facts of type (1) or (2).

Analysis of the cases will show that this court sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3). As will become clear from the following analysis of repesentative cases, the present case lacks evidence of any of the three types.

In *People* v. *Hillery, supra,* 62 Cal.2d 692, the jury could reasonably infer that the defendant engaged in the following "extended course of conduct": defendant parked his car near the victim's (a 15-year-old girl's) house, entered the house surreptitiously, seized the victim while she was sewing and covered her head with a towel and slip to prevent outcry or identification, cut a length of cord in another room to secure her hands behind her, took the victim's scissors. dragged her to a nearby irrigation ditch where her body was subsequently found, engaged in a struggle with the victim, and then plunged the scissors directly into her chest. (*Id.* at p. 704.)

*Hillery* represents a case of very strong type (1) evidence: the defendant's surreptitious conduct subjection of his victim to his complete control, and carrying off of his victim to a place where others were unlikely to intrude, can be described as "planning" acitivity directly related to the killing. Moreover, there is also strong evidence of type (3): directly plunging a lethal weapon into the chest evidences a deliberate intention to kill as opposed to the type of "indiscriminate" multiple attack of both severe and superficial wounds which defendant engaged in in the instant case.

In *People* v. *Quicke* (1964) 61 Cal.2d 155 [37 Cal.Rptr. 617,

390 P.2d 393], the defendant came to the victim's town to find a girl with whom to have sexual intercourse. He spent the afternoon of the killing looking for such a girl. Defendant followed the same procedure with the victim that he had used successfully two weeks earlier. When the victim did not capitulate to his threats, the defendant killed her, drove her to a less travelled area, and then, after considerable preparation, engaged in intercourse with her corpse. The court held that the evidence reasonably supported the inference that "upon preconceived reflection [the defendant] deliberately formed a plan to coerce the victim into engaging in intercourse with him while she was alive, or if that failed, to kill her to satisfy his desires with her corpse." (*Id.* at p. 159.)

*Quicke*, like *Hillery*, involves substantial evidence of type (1)—pre-killing "planning" activity. In both cases the activity can be most meaningfully described as intended to result in that fate (in *Quicke*, forcible rape and/or killing if rape unsuccessful) which the victim in fact suffered. Moreover, the record in *Quicke* also contains evidence of type (2) insofar as defendant engaged in similar conduct on a previous occasion.

In *People* v. *Kemp* (1961) 55 Cal.2d 458 [11 Cal.Rptr. 361, 359 P.2d 913], the defendant entered his victim's apartment through a window after removing the screen, found the victim alone in bed, tied stockings around her neck and hands, gagged her with a washcloth, and then raped and strangled her. In *Kemp*, as in *Hillery*, defendant's surreptitious coming upon the victim and calculated efforts to prevent her from identifying her assailant or crying out for help, together with the deliberate manner of killing—evidence of types (1) and (3)—point to a killing which is the result of "preconceived design" as opposed to "an explosion of violence." (*People* v. *Anderson, supra,* 63 Cal.2d at p. 360.)

In *People* v. *Cartier* (1960) 54 Cal.2d 300, 309 [5 Cal.Rptr. 573, 353 P.2d 53], the evidence supported an inference that defendant, after becoming angered over his wife's talking to a sailor in the last of several bars that they had been in on the evening of the killing, went home with his wife and then hit her over the head with a blunt instrument, procured various knives from the kitchen, brought them to the room where his wife's body was found and, on the basis of his knowledge as a butcher, made superficial cuts on her body to locate the heart and vagina and then murdered her by severing them from her body.

*Cartier* represents a case of strong type (3) evidence: the

manner of killing must have been the result of calculation. Moreover, the superficial wounds apparently inflicted with blunt instruments supply evidence of "planning" activity intended to dull the victim's resistance; the weapons used were consistent with a deliberate choice by defendant made on the basis of his experience as a butcher; and the fatal wounds were consistent with a sexual-jealousy "motive" for the killing which the evidence reasonably supported. *Cartier* thus involves evidence of all three types which points to a "calculated type of killing." (*Id.* at p. 310.)

*People* v. *Cole* (1956) 47 Cal.2d 99 [301 P.2d 854, 56 A.L.R.2d 1435], involved a defendant living with an impecunious woman (his victim) and desirous of marrying a well-to-do woman. The evidence established that the defendant secretly took the latter's gun from her dresser the week before the killing, that he was carrying it on the evening of the killing, and that he used it to kill his victim. Moreover, the evidence also tended to show that defendant planned to implicate the wealthier woman so as to secure her assistance in concealing his guilt and that he killed the victim to remove her as an obstacle to his marital plans. As the court pointed out, "a showing of motive indicating that the killing was planned" tends to support an inference of premeditation and deliberation. (*Id.* at p. 107.) *Cole* thus represents a case of primarily type (2) evidence supported by type (1) evidence.

In *People* v. *Stroble* (1951) 36 Cal.2d 615 [226 P.2d 330], affd. 343 U.S. 181 [96 L.Ed. 872, 72 S.Ct. 599], the defendant's victim, a six-year-old girl, was a friend of defendant's granddaughter and had previously submitted to defendant's fondling her. On the day of the killing she found defendant alone in his son-in-law's house where she came to find her friend. When she objected to, and started screaming because of, defendant's attempt to molest her, he tried to silence her by choking her. After she became quiet and then started to move again, defendant inflicted several direct, deliberately placed fatal wounds with a hammer, an ice pick, the blunt end of an axe, and a kitchen knife, for the claimed purpose of relieving her suffering.

In *Stroble,* as in *Cartier,* the defendant selected particular instruments to kill his victim after rendering her totally passive (type (1) evidence), had a relationship with the victim prior to the killing from which a "motive" could be inferred (type (2) evidence), and inflicted deliberately placed blows on the victim, all of which must have been intended to

result in death (type (3) evidence). While the condition of the victim's body and other physical evidence at the scene of the crime in *Stroble, when considered in light of* the defendant's conduct immediately prior to the killing and his past relationship with his victim, point to a "calculated" killing, the condition of the victim's body in the instant case, *when considered in light of the absence of* any evidence of the defendant's conduct immediately prior to the killing or any "unusual" relationship with the victim, points to a "random" attack which was explosive rather than calculated. The Attorney General's argument that *Stroble* holds that premeditation and deliberation may be inferred from the condition of the body and other physical evidence at the scene of the crime, and that *therefore* there is sufficient evidence of premeditation and deliberation in the instant case is thus totally devoid of merit.

The present case is strikingly similar to *People* v. *Granados, supra,* 49 Cal.2d 490, in which this court reduced a verdict of first degree murder to second degree murder on the ground that the evidence was insufficient to show either premeditation and deliberation or that the killing occurred in the course of an attempted violation of section 288 of the Penal Code. The evidence of premeditation and deliberation in *Granados,* while clearly insufficient to sustain the verdict of first degree murder on that theory, was stronger than in the present case in which we find no evidence from which the jury could *reasonably* infer that defendant acted " '*with a deliberate and clear intent to take life.*' " (*People* v. *Holt, supra,* 25 Cal.2d 59, at p. 91, quoting from *People* v. *Howard* (1930) 211 Cal. 322, 329 [295 P. 333, 71 A.L.R. 1385].)

In *Granados,* defendant lived in a common law relationship with the mother of his victim, a 13-year-old girl. After taking the deceased and her brother to a real estate office, defendant gave the brother a note requesting money to take to his mother who worked nearby. When the brother returned home with the requested money he saw defendant at the rear of the house. As he started to enter the house, defendant came running to him and asked him to get some alcohol for his sister (decedent) who had fainted. The brother noticed blood on one of defendant's hands and that defendant had the other hand behind his back.

The brother unsuccessfully looked for some alcohol. Defendant then suggested they get a doctor and an ambulance. The brother then noticed that defendant's hand had been washed. Defendant then drove the brother to a drug-

store, gave him 50 cents for some alcohol, and told him he would wait for him. The defendant drove away and did not return for the brother.

Defendant then called the mother and told her the victim had poisoned herself. The mother returned to the house with a friend who found the victim's body in the bedroom lying on the floor. Her skirt was pulled up exposing her private parts, there were bloodstains on the wall, floor, and decedent's head, and a machete covered with blood was lying in a corner of the living room behind a small heater.

Defendant testified that on the day of the killing the girl was helping him clean the house and that he asked her if she was a virgin, to which she replied that it was none of his business. Defendant said that she had never answered him in that way and that he therefore struck her with his hand, but did not remember striking her with the machete.

Decedent's mother testified that she had warned defendant that the next time he bothered her daughter, she would tell the police, and that defendant in reply threatened to kill her and both her children if she did.

The prosecution argued that the murder was sexually motivated. This court, per Justice McComb, held that the evidence was insufficient as a matter of law to support a verdict of first degree murder. (49 Cal.2d at p. 497.)

Applying the standards developed above to *Granados*, we find that the only evidence of (1) defendant's behavior prior to the killing which could be described as "planning" activity related to a killing purpose was defendant's sending the victim's brother on an errand and apparently returning home alone with the decedent. Such evidence is highly ambiguous in terms of the various inferences it could support as to defendant's purpose in so behaving. The evidence of (2) defendant's prior behavior with the victim (alleged sexual molestation and his question as to her virginity) is insufficient to support a reasonable inference that defendant had a "motive" to kill the girl, which could in turn support an inference that the striking with the machete was the result of a "preconceived design" and "forethought." Finally, the evidence of (3) the manner of killing (brutal hacking) does not support a reasonable inference of deliberately placed blows, which could in turn support an inference that the act of killing was premeditated rather than "hasty and impetuous."

Justice Carter dissented in *Granados* on the ground that the following evidence was sufficient to sustain a finding of

premeditation and deliberation: the nature of the instrument, the condition of the body, defendant's sending the brother on an errand immediately prior to the time of the killing, and defendant's prior threats against the girl and her family. (49 Cal.2d at pp. 498-499.) Justice Carter's dissent demonstrates that there was some evidence of premeditation and deliberation in *Granados*, albeit insufficient. Here, on the other hand, we do not have any evidence of either (1) any conduct by defendant prior to the killing which would indicate that he was planning anything, felonious or otherwise, or (2) any behavior towards Victoria from which the jury could reasonably infer that defendant had a ''motive'' or desire to sexually attack and/or kill her. The evidence of (3), the manner of killing and the condition of the body, is the same in both cases: the only inference which the evidence reasonably supports in either case is that the killing resulted from a ''random,'' violent, indiscriminate attack rather than from deliberately placed wounds inflicted according to a preconceived design. (Contrast *People* v. *Cartier, supra,* 54 Cal.2d 300; *People* v. *Stroble, supra,* 36 Cal.2d 615.)

Finally, the defendant in *Granados,* as here, attempted to ''cover up'' the crime by lying to the brother and the mother of the victim. Although this type of evidence may possibly bear on defendant's state of mind *after* the killing, it is irrelevant to ascertaining defendant's state of mind immediately prior to, or during, the killing. Evasive conduct shows fear: it cannot support the double inference that defendant planned to hide his crime at the time he committed it and that therefore defendant committed the crime with premeditation and deliberation.

The present case is also similar to *People* v. *Craig, supra,* 49 Cal.2d 313, in which this court, per Justice Carter (who dissented in *People* v. *Granados, supra*), reduced a verdict of first degree murder to second degree murder on the ground that the evidence was insufficient to show either premeditation and deliberation or that the killing occurred in the course of attempted rape. The evidence of premediation and deliberation in *Craig* is also stronger than that in the present case.

In *Craig* the defendant told someone the morning of the murder that he would ''like to have a little loving.'' (49 Cal.2d at p. 315.) On the evening of the murder he went to a bar where he threatened a woman who refused to dance with him. Later that evening he left another bar with a man who saw the victim approaching the intersection where he parted company with the defendant.

The victim was found the next morning under a car at a service station near the above intersection. She apparently had been dragged there. She was wearing a raincoat with only a slip and panties on underneath. All three garments were ripped open so that the front part of her body was exposed. She was lying on her back with her legs spread apart. She had suffered multiple contusions, caused by an estimated 20 to 80 blows. Four heel marks were found on her body, and a key to the defendant's hotel room was found in her clothing. The morning after the murder defendant told someone that "I beat up a woman" and that when he hit them "they stayed hit." (49 Cal.2d 313, at p. 317.)

The court held that "the evidence, as a matter of law, shows only second degree murder. . . . *The record shows a killing accomplished with great brutality, but does not show any premeditation.*" (Italics added.) (49 Cal.2d at p. 318.)

In *Craig,* as opposed to the present case, there was some evidence of (1) defendant's conduct prior to the killing which would support an inference that he was looking for a girl with whom to engage in sexual intercourse. Although such conduct may be described as "purposeful" behavior, it has no bearing as to an *intention to kill* his victim. As in the present case, no evidence in *Craig* points to (2) any prior relationship or behavior with the victim from which the jury could infer that defendant entertained a "motive" for killing his victim. And in both cases the evidence of (3), the way in which the victim suffered death, points only to a violent, brutal attack; it cannot support the double inference that the wounds were inflicted deliberately and in a particular manner, and that therefore the killing was deliberate and executed with premeditation. Finally, in *Craig,* the evidence of the statements and conduct of defendant after the killing resembles the evidence of defendant's cleaning up and false stories here: such evidence is highly probative of whether defendant committed the crime, but it does not bear upon the state of the defendant's mind at the time of the commission of the crime.

We conclude that a finding of premeditation and deliberation cannot be sustained in the absence of any evidence of (1) defendant's actions prior to the killing, (2) a "motive" or "reason" from which the jury could reasonably infer that defendant intended to kill Victoria, or (3) a manner of killing from which the jury could reasonably infer that the wounds were deliberately calculated to result in

death. As in *People* v. *Granados, supra,* 49 Cal.2d 490, and *People* v. *Craig, supra,* 49 Cal.2d 313, the evidence suffices only to support a verdict of second degree murder.

(b) *The evidence is insufficient to support a finding of a specific intent to commit an offense punishable by section 288.*

"[I]n order to establish a defendant's guilt of first degree murder on the theory that he committed the killing during the perpetration [or attempted perpetration] of one of the enumerated felonies [in section 189 of the Penal Code], the prosecution must prove that he harbored the specific intent to commit one of such enumerated felonies." (*People* v. *Sears* (1965) 62 Cal.2d 737, 744 [44 Cal.Rptr. 330, 401 P.2d 938].) Additionally, the evidence must establish that the defendant harbored the felonious intent either prior to or during the commission of the acts which resulted in the victim's death; evidence which establishes that the defendant formed the intent only after engaging in the fatal acts cannot support a verdict of first degree murder based on section 189. (*People* v. *Hudson* (1955) 45 Cal.2d 121, 125 [287 P.2d 497].)

In order to sustain the verdict of first degree murder, here, therefore, the evidence must be sufficient to support a reasonable inference that either immediately prior to or during defendant's infliction of the fatal wounds on Victoria, he intended to "wilfully and lewdly commit any lewd or lascivious act . . . upon or with the body, or any part or member thereof," of Victoria, "with the intent of arousing, appealing to, or gratifying the lust or passions or sexual desires" of himself or Victoria. (Pen. Code, § 288.) We explain why the evidence is insufficient to support a reasonable inference that the defendant harbored such an intent.

The evidence upon which the prosecution relies in urging a violation or attempted violation of section 288 is indistinguishable from that held insufficient as a matter of law to support a verdict of first degree murder in *People* v. *Granados, supra,* 49 Cal.2d 490. Here the prosecution argues that the nature of the wounds and the clothing of the victim, the appearance of blood in several rooms of the house. and the lack of blood on any of defendant's clothing except his socks and shorts, suffices to support an inference that defendant was almost naked while attacking Victoria and pursued her through several rooms of the house and slashed at and ripped off her clothing with the intent to commit a lewd act upon her to satisfy his sexual desires. In *Granados* the victim was found with her skirt pulled up exposing her private parts in a room

with bloodstained walls and floor. The only difference between the condition of the victim's body in the two cases is that here the vaginal area was lacerated. Since this wound, however, was only one of several randomly inflicted wounds covering the victim's entire body, this piece of evidence has little if any bearing on the issue whether defendant stabbed Victoria with the specific intent of satisfying his sexual desires by committing a wilfully lewd act upon her.

Moreover, here, unlike in *Granados*, the prosecution failed to present any evidence during the guilt phase of the trial that defendant had ever formed any sexual feelings towards, or engaged in any kind of lewd conduct with, Victoria or any other person. In *Granados*, on the other hand, the defendant testified that he became angered because of the tone of the victim's response to his question as to her virginity, and the victim's mother testified that she had threatened to tell the police if the defendant tried to bother the daughter again, and that the defendant had responded that he would kill the whole family if she did. Thus, in *Granados*, the prosecution presented evidence independent of the particular act of killing and of the condition of the victim's body. This evidence disclosed the defendant's sexual interest in the victim and his threats that if such interest were reported he would retaliate against the entire family. Here, on the other hand, the prosecution presented no evidence relating to a possible section 288 offense other than that of the act of murder itself.

The present case also resembles, as we explained above, *People* v. *Craig, supra*, 49 Cal.2d 313, in which this court held the evidence insufficient to support a finding of intent to rape the murder victim. In *Craig* the victim was found wearing a raincoat with only a slip and panties on underneath. All three garments were ripped open exposing the front part of her body; the victim was lying on her back with her legs spread apart. She had suffered multiple contusions. Moreover, in *Craig* as in *Granados*, and unlike the present case, the defendant displayed an interest in sexual activity immediately prior to the murder. In *Craig* the defendant told someone on the morning of the murder that he would "like to have a little loving," and on the evening of the murder he threatened a woman in a bar who refused to dance with him. We held that the evidence was insufficient to establish that defendant harbored the specific intent to commit rape upon the murder victim. (49 Cal.2d at pp. 318-319.)

Our conclusion in *Craig* explaining the insufficiency of the evidence to support a first degree murder verdict based

on the felony-murder theory applies equally to the present case: " 'When the killing is proved to have been committed by the defendant, and nothing further is shown, the presumption of law is that it was malicious and an act of murder; but in such a case the verdict should be murder of the second degree, and not murder of the first degree.' [Citations.] It appears that in the case at bar there is a total lack of satisfactory evidence that the killing was committed either in the attempt to commit [a violation of section 288] or in the commission of [an act punishable by section 288]; that the evidence shows no more than the infliction of multiple acts of violence on the victim and that even though the killing was an extremely brutal one the People have proved only that the defendant was guilty of second degree murder [citation]." (*Id.* at p. 319.) Indeed, were we to hold the evidence in the present case sufficient to support a fiirst degree murder verdict on the theory that the murder was committed during a violation or attempted violation of section 288, any brutal murder of a person under the age of 14 years could be found sufficiently "sexually motivated" to constitute first degree murder under the section 288 felony-murder doctrine.

The judgment is modified by reducing the degree of the crime to murder of the second degree and, as so modified, is affirmed. The cause is remanded to the trial court with directions to arraign and pronounce judgment on defendant in accordance with the foregoing ruling.

Traynor, C. J., Peters, J., and Peek, J.,* concurred.

BURKE, J.—I dissent. The substantial circumstantial evidence presented in this case supports the verdict of the jury that the homicide was committed by defendant in his attempted performance or actual performance of lewd or lascivious acts upon the body of the child victim in violation of Penal Code section 288 and therefore constituted first degree murder under the felony-murder rule (Pen. Code, § 189).

The jury could reasonably infer from the evidence adduced that the underlying motive of the crime was sexual gratification: defendant chose a time when he was alone in the house with the little girl; the window blinds were down and the doors locked; he pursued the child throughout the house inflicting one wound after another; he ripped out the crotch of her panties; he tore her remaining clothes from her; he had

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

removed his own clothes excepting his socks—there was no other logical explanation for the absence of other bloody male clothing and he took a shower immediately after the crime; furthermore, at one time during the assault he had the child on the bed as evidenced by the large blood stain found in the center of the mattress; and, finally, a number of the wounds inflicted upon the child could be considered sexual in nature, particularly the thrust of the knife into her vagina, the cutting through to the anal canal and the numerous cuts and contusions of her private parts and thighs.

In the face of this supportive evidence it is not the function of this court to reweigh the evidence. (*People* v. *Hillery,* 62 Cal.2d 692, 702-703 [44 Cal.Rptr. 30, 401 P.2d 382].)

Although I believe there is credible evidence from which the jury could find a premeditated homicide, e.g. the locking of the doors (whether before or after the actual killing is a matter of conjecture), the duration of the assault, the pursuit through many rooms with a quantity of blood being left in each room, the extensive stabbings many of which would have sufficed as fatal, the removal of the murder weapon from one room and the apparent repeated use of it in other rooms, it is not necessary to rest the jury's determination of first degree murder on that ground since the evidence is substantial that the homicide was first degree murder under the felony-murder rule.

This case is clearly distinguishable from *People* v. *Granados,* 49 Cal.2d 490 [319 P.2d 346], relied on by the majority. In *Granados,* there was every indication of a killing by a sudden blow from a machete and no evidence whatsoever of any molestation, cutting, stabbing of the private parts of the child. The only physical suggestion of a possible sex offense motive was that the child's dress was pulled up above the vaginal area. However, this area was concealed underneath an apron which she wore over the dress. There was no evidence of deliberate or forceful removal of all clothing as in the case before us.

The majority also rely upon *People* v. *Craig,* 49 Cal.2d 313 [316 P.2d 947], but here, again, there are substantial differences between the two cases. *Craig* does not even deal with a Penal Code section 288 situation. The victim in *Craig* was not a child but an adult woman and as the opinion points out there was ''No evidence of a sexual attack on the body of the decedent.'' There were no blood smears on defendant's levis or shorts. The victim had on her raincoat, a night gown or slip and panties and although they had been torn open to expose

the front part of the body a review of the evidence supports the conclusion of this court in *Craig* that the victim died from a vicious beating and that there was no evidence of an attempted rape or sex crime, despite defendant's statement earlier in the day that he was seeking a girl for sex purposes.

In the instant case the question of whether the evidence showed that the defendant had the requisite intent to commit lewd acts upon the child victim was for the jury to determine from all the surrounding circumstances. (*People* v. *Meichtry,* 37 Cal.2d 385, 389 [231 P.2d 847].) In the face of the physical evidence produced in this case I submit it cannot be said that no reasonable ground was shown to support an inference that such intent existed.

I would affirm the judgment.

McComb, J., concurred.

SULLIVAN, J.—I dissent. I agree with the dissenting opinion of Justice Burke insofar as it concludes that there is sufficient evidence to support a verdict of first degree murder on the theory that the homicide was committed by defendant in the performance of, or the attempt to perpetrate, an offense proscribed by Penal Code section 288. Having reached such conclusion, I am of the view as is Justice Burke, that we are not required to uphold the verdict on the additional theory of deliberate and premeditated murder. Indeed I would join his dissenting opinion were it not for the fact that, while deeming it unnecessary to rest the verdict on a theory of deliberate and premeditated murder, the author nevertheless comments on the sufficiency of the evidence to sustain the verdict on such theory. I am not disposed to reach this question.

I would affirm the judgment.

Respondent's petition for a rehearing was denied January 22, 1969. Peek, J.,* sat in place of Mosk, J., who deemed himself disqualified. McComb, J., Burke, J., and Sullivan, J., were of the opinion that the petition should be granted.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.