Filed 6/22/26  P. v. Smith CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G064907 |
| v. | (Super. Ct. No. 20WF1002) |
| ARYAN VITO SMITH, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Sheila F. Hanson, Judge. Affirmed.

William Paul Melcher, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Robin Urbanski and Laura Baggett, Deputy Attorneys General, for Plaintiff and Appellant.

Defendant Aryan Vito Smith made plans to meet Treeanna Nichols, a 23-year-old sex worker, at a hotel where Nichols was staying. After confirming she would be alone in her room, Smith armed himself with a pocketknife,[1] put on a black jacket, parked at a nearby liquor store, and entered Nichols's room. Within 11 minutes, he stabbed Nichols, who was unarmed, 28 times in multiple places on her body using differing levels of force, leaving her face down bleeding to death. Images, video, and messages found in defendant's possession after the killing revealed he had an ongoing fantasy about torturing women, referred to himself as sadistic, and had experience with and loved "knife play."[2]

Defendant pleaded guilty to murdering Nichols with the intent to kill but agreed to let the trial court determine, without a jury, whether the murder was of the first or second degree. Following an evidentiary hearing, the court found the killing constituted first degree murder. Defendant challenges that finding based on lack of substantial evidence and alleged error by the court in applying an incorrect standard of proof. We affirm.

---

[1] The murder weapon had a three-inch blade and wood looking handle, and both defendant's and Nichols's blood was found on it.

[2] "Knife play" refers to the use of a knife as a form of sensation or domination, as described by defendant's expert at the hearing that is the subject of this appeal. Common activities in knife play might include taking a knife that has been dulled and dragging it across the skin of a person to create the sensation of the person being cut without actually breaking the skin.

FACTUAL SUMMARY AND PROCEDURAL BACKGROUND

On March 8, 2024, defendant pled guilty as charged to one count of murder (Pen. Code, § 187, subd. (a)),[3] with the personal use of a knife, a dangerous and deadly weapon (§ 12022, subd. (b)(1)), reserving the issue of the degree of the murder (first or second degree) to be determined by the trial court. The factual basis for the plea stated: "In Orange County, California, on [February 6, 2018], I did unlawfully and with malice aforethought kill T. Nichols, a human being. In doing so I personally used a knife to stab the victim resulting in her death."

The People moved to fix the murder at first degree and submitted briefing to the trial court, which included a summary of the evidence from a flash drive that was admitted at the hearing as court exhibit No. 1.[4] The flash drive contained nine folders, labeled exhibits 1 through 9, that consisted of: (1) crime scene photographs; (2) the autopsy report; (3) a video of knife wounds to defendant's fingers on his right hand; (4) a DNA stipulation; (5) body worn camera footage of defendant's arrest (6) murder weapon photos; (7) photos and video of knife play found on defendant's cell phone; (8) photos found on defendant's cell phone that depict bondage, discipline, dominance, and submission (BDSM); and (9) a report by police summarizing the videos and images extracted from defendant's cell phone.

---

[3] All further statutory references are to the Penal Code.

[4] We obtained court exhibit No. 1 from the trial court following briefing in this matter. The trial court reviewed and considered the contents of court exhibit No. 1. On appeal, defendant does not challenge either the factual summary of evidence set forth in the People's briefing or the admission of court exhibit No. 1 into evidence.

The trial court conducted an evidentiary hearing over two days in October and November 2024. According to the evidence presented at the hearing, Nichols was 23 years old when she was killed on February 6, 2018, and had been working as a sex worker out of the hotel room where she perished. Nichols and defendant had been communicating by cellphone since early November 2017. On the day of the murder, defendant called and texted Nichols and made a date with her. Nichols gave defendant her room number. Defendant asked if Nichols had a friend "to play with them" and Nichols responded she did not, that she was alone. Defendant parked in a nearby liquor store parking lot, walked to the hotel, arrived at Nichols's room at 3:08 p.m., and found her alone and unarmed. Defendant left the room 11 minutes later at 3:19 p.m. after stabbing Nichols multiple times.

Nichols's bloodied body was found later that night lying face down on the floor of the hotel room. The condition of the room indicated a violent struggle had occurred. Four of Nichols's fake fingernails on her right hand had been ripped off and were found strewn throughout the room. The bed had been pushed away from the wall. The hotel telephone was on the floor next to Nichols, covered in blood.[5] Nichols's blood was found everywhere,

---

[5] Both parties state the telephone cord was wrapped around Nichols's *neck* and cite to the People's briefing in support of the first degree murder determination as evidence for this fact. The crime scene photos included in court exhibit No. 1, however, do not reflect this. They show a telephone on the floor between a bedside table and Nichols's prone body. The phone is an older push button style, with a base unit that contains the push buttons for dialing, a handset, the cord that connects the base unit to the handset, and a wire that goes from the base unit to the wall. In the crime scene photos, the base unit is sitting upright on the floor and the handset is lying next to it, still connected to the handset cord. The wire, however, has been removed from the wall and is wrapped around Nichols's *left leg*. The photos show no cord or wire wrapped around her neck.

4

including inside the door, on the door jam, on the door handle, on the walls by the front door, and on a small air conditioner mounted on the wall next to the door.

The autopsy revealed Nichols had been stabbed 28 times, including five times in the head, 12 times in her neck, six times in her back, and five times in her stomach and abdomen. She died from massive blood loss. The carotid arteries on both sides of her neck had been severed, causing blood to flow out of her neck onto the floor. The stab wounds on her back and chest punctured both her right and left lungs, making it impossible for her to breathe. The physical evidence showed Nichols fought back during the attack, as demonstrated by her broken fingernails and defensive stab wounds on her right hand. During the attack, the knife apparently became saturated in blood and was so slippery that when the blade hit bone or thick muscle tissue and stopped suddenly, defendant's hand slipped off the knife handle and onto the blade; this explains the deep cuts to defendant's fingers on his right hand, which left a trail of blood that ultimately was found to match defendant's DNA.

Police recovered the murder weapon from defendant's residence. Police also found thousands of pornographic photographs and videos on defendant's cell phone. Of relevance to the murder, there were eight photographs and one video depicting women being subjected to "knife play," and 56 photographs depicting women who appear to be in pain with inflicted injuries.

Police found message threads with several women on defendant's phone, including messages with a woman named Megan that occurred after Nichols's murder. In those messages, defendant told Megan, "I love knife play," and said he had done "a lot of stuff" with respect to knife play and

"[m]ost subs aren't comfortable with my sadistic level." Defendant provided Megan instructions on how to perform "knife play." In the same messages in which he discussed "knife play," defendant told Megan how stressed he was— "worse than [he's] ever been"—because he had gotten into a car accident he had to report and was concerned that when he made the report, he might go to jail. He told Megan he was worried that once in jail, his fingerprints and DNA would be taken, and when that happened, he "won't be okay" and will "never see [his] kids again" or be able to talk to Megan again.

Both parties called expert psychologists to testify at the hearing. The People called an expert in sadistic killing. According to that expert, sadistic behavior is conduct from which a person derives pleasure at the suffering and physical or psychological humiliation and suffering of another human being. The expert testified defendant had an ongoing fantasy with torture on women that was "stimulating to him." He testified some of the pornographic material found on defendant's phone went beyond the norms of the BDSM community, depicting individuals suffering and being degraded in horrific ways. The expert opined the large number of stab wounds was consistent with sexually sadistic behavior and that certain of the sexually sadistic images/videos found on defendant's phone are "consumed by people that have extreme appetites and that lean and move towards crossing the line into harming people because that's what gets them off." He also opined the murder was consistent with predatory violence, which he explained is violence that is "proactive, not in response to an immediate perceived threat and [which] frequently is driven by a cognitive process as opposed to an emotional one often reflecting fantasy. It is purposeful. It is goal-directed. . . . often associated with what we call 'hunting behavior' as opposed to affective

6

violence, which is different." By comparison, affective violence is defensive in nature.

The defense called a social psychologist to testify as an expert. He explained BDSM encompasses a variety of consensual practices, fantasies, and interests that involve restraining or tying a person up; engaging in disciplinary practices, such as controlling a partner or inflicting forms of punishment on a partner; dominating a partner in terms of exploring power in terms of sexuality or submitting to a partner; and sadism and masochism. Within the BDSM community, consent is the central feature that distinguishes BDSM from abuse and criminal activity.

After considering all the evidence presented to it, the trial court found beyond a reasonable doubt defendant had committed first degree premeditated murder. The court based its decision on the nature in which the crime was committed, i.e., the repeated use of a knife to inflict multiple separate wounds, some penetrating deeply and others very superficial. The court stated, "[t]he infliction of 28 separate strikes, whether they were deep and penetrating or even just superficial, leads this Court to believe that that was an action in which Mr. Smith knew the consequences of his actions, considered it, and decided to continue thereby inflicting the death." The court sentenced defendant to 25 years to life in prison on count one, plus one year for the weapon enhancement. Defendant timely appealed.

DISCUSSION

Defendant contends the trial court's first degree murder determination was erroneous for two reasons. First, defendant contends the evidence was insufficient to support the court's determination the murder was committed with premeditation and deliberation. According to defendant, the evidence pointed to a violent, brutal attack that was committed hastily.

7

Second, defendant contends that, by finding there was no evidence that pointed away from first degree murder, the court applied the wrong test for determining whether the murder was committed with premeditation and deliberation. We find no merit in either contention.

## I.

### STANDARD OF REVIEW

"In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.) "The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence." (*Ibid.*) ""Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court[,] which must be convinced of the defendant's guilt beyond a reasonable doubt. "'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.""""" (*Ibid.*)

## II.

### APPLICABLE LAW RELATING TO FIRST DEGREE MURDER

"'Murder is the unlawful killing of a human being . . . with malice aforethought.' (Pen. Code, § 187, subd. (a).) If the murder is 'willful, deliberate, and premeditated,' it is first degree murder. (*Id.*, § 189, subd. (a).) ""In this context, "premeditated" means "considered beforehand," and

8

"deliberate" means "formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action.""" [Citation.] "'An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse.'" [Citations.] "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . .""" (*People v. Morales* (2020) 10 Cal.5th 76, 88.)

In *People v. Anderson* (1968) 70 Cal.2d 15 (*Anderson*), the California Supreme court "'identified three categories of evidence relevant to resolving the issue of premeditation and deliberation: planning activity, motive, and manner of killing.' [Citation.] 'However, these factors are not exclusive, nor are they invariably determinative.' [Citation.] "'*Anderson* was simply intended to guide an appellate court's assessment whether the evidence supports an inference that the killing occurred as the result of preexisting reflection rather than unconsidered or rash impulse."'" (*People v. Streeter* (2012) 54 Cal.4th 205, 242.)[6]

_____

[6] In the decades following *Anderson*, the California Supreme Court repeatedly has cautioned that *Anderson* only articulates "guidelines" that are merely "descriptive" (See *People v. Perez* (1992) 2 Cal.4th 1117, 1125; *People v. Mendoza* (2011) 52 Cal.4th 1056, 1069–1072 [court used the *Anderson* factors "as a guide"]); that the three factors or categories of evidence identified in *Anderson* are not "exhaustive" (*People v. Pride* (1992) 3 Cal.4th 195, 247); and that "*Anderson* does not require that these factors be present in some special combination" (*Ibid*.) The Court has emphasized: "The *Anderson* guidelines are 'descriptive, not normative,' and reflect the court's attempt 'to do no more than catalog common factors that had occurred in prior cases.' [Citation.] In developing these guidelines, the court did not redefine the requirements for proving premeditation and deliberation." (*People v. Young* (2005) 34 Cal.4th 1149, 1183.)

## III.

### SUBSTANTIAL EVIDENCE SUPPORTS THE
### TRIAL COURT'S FINDING OF FIRST DEGREE MURDER

Defendant argues the brutal circumstances surrounding the murder are not sufficient to show it was the result of some plan, i.e., "careful thought and weighing of considerations," but rather showed he acted merely on impulse. (*Anderson, supra*, 70 Cal.2d at pp. 24–25.) We disagree. Although the circumstantial evidence in this case may be susceptible to defendant's interpretation of an impulse killing, the circumstances reasonably justify the trial court's finding of first degree murder. (See *People v. Rodriguez, supra,* 20 Cal.4th at p. 11 ["""""the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment""""" where """""the circumstances reasonably justify the trier of fact's findings"""""].)

We address below each of the *Anderson* factors.

### A. *Planning Activity.*

Planning activity refers to "facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing." (*Anderson, supra*, 70 Cal.2d at pp. 26–27.) Here, the evidence showed defendant had communicated with Nichols for months before he made a date to meet her. It further shows that, after arranging a time and place to meet on the day of the murder, defendant went to the meeting place armed with a knife and dressed in dark clothing. Rather than parking at the hotel where they were to meet, he parked at a nearby liquor store and walked to the hotel. And before going to the hotel room, he confirmed with Nichols she

10

would be alone. All of this is substantial evidence of activity directed toward, and intended to result in, the killing.

*B. Motive.*

In examining motive, we look at facts relating to "the defendant's *prior* relationship and/or conduct with the victim from which the [trier of fact] could reasonably infer a 'motive' to kill the victim." (*Anderson, supra*, 70 Cal.2d at p. 27.) To support a finding the murder was of the first degree, the motive evidence must "'support an inference that the killing was the result of a "pre-existing reflection" and "careful thought and weighing of considerations" *rather than* "mere unconsidered or rash impulse hastily executed."'" (*People v. Boatman* (2013) 221 Cal.App.4th 1253, 1268, quoting *Anderson, supra*, 70 Cal.2d at p. 27.)

There was ample evidence of motive here. Defendant knew Nichols was a sex worker. By defendant's own admission, he was sadistic, a fact confirmed by the contents of the images and videos recovered from his phone. Moreover, as explained by the People's expert, the evidence showed defendant had an ongoing fantasy about torturing women and loved "knife play," and a reasonable inference could be made from the evidence that defendant developed a desire to move towards crossing the line into harming someone for his own sexual gratification. All of this demonstrates motive for the fatal assault on Nichols.

*C. Manner of Killing.*

The manner of killing refers to "facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' . . . ." (*Anderson, supra,* 70 Cal.2d at p. 27.)

11

Here, the numerous stab wounds to Nichols's neck, lungs and body, including those severing both of her carotid arteries, support a finding of premeditation and deliberation. (See *People v. Lewis* (2009) 46 Cal.4th 1255, 1293 [the "additional act of slashing her throat 'is indicative of a reasoned decision to kill'"]; see *People v. Prince* (2007) 40 Cal.4th 1179, 1253 ["clustered stab wounds support an inference of a deliberate killing"].) Defendant inflicted 28 separate stab wounds on Nichols, including five to her head, 12 to her neck, six to her back, and five to her abdomen. As the trial court noted, some of the wounds were deep. The stab wounds to each side of Nichols's neck severed her carotid arteries, and the stab wounds to her back and chest punctured both of her lungs. In addition, the sheer amount of time it would have taken defendant to inflict so many stab wounds demonstrates premeditation and deliberation. Indeed, the evidence shows defendant was inside the hotel room for 11 minutes, which certainly is sufficient time for careful reflection.

Based on the foregoing, we conclude there was sufficient evidence to support a finding that defendant's actions were the "'result of preexisting thought and reflection rather than unconsidered or rash impulse.'" (*People v. Pearson* (2013) 56 Cal.4th 393, 443.)

IV.

THE RECORD DOES NOT SUPPORT DEFENDANT'S CONTENTION THE TRIAL COURT APPLIED THE WRONG STANDARD

We also reject defendant's contention the trial court *presumed* the murder was in the first degree because it stated no evidence pointed *away* from that conclusion. The record of the hearing does not support this argument. The record shows the court understood its role as the trier of fact, understood the People had the burden of proof beyond a reasonable doubt,

12

and applied that burden correctly in reaching its finding of first degree murder.

During argument at the conclusion of the hearing, defendant's counsel acknowledged the trial court "knows that even in this hearing it is bound by the standard of proof beyond a reasonable doubt, and the way in which it needs to treat circumstantial evidence." Defendant's counsel argued there "is simply no evidence that proves beyond a reasonable doubt to this Court that Mr. Smith's actions in that room were carefully considered." Counsel stressed that it is the People's burden to introduce admissible evidence proving first degree murder and that, if they fail to do so, "the degree of murder needs to be affixed at second."

In response to counsel's argument, the Court stated it had spent "considerable time considering exactly the point that you've been making" and that "you're absolutely correct in terms of the legal standard that [the prosecution] must prove beyond all reasonable doubt—and if there are two reasonable interpretations, I must accept the one pointing to lack of proof as to willful, deliberated, and premeditated." The court continued, "however, I don't believe there is a reasonable interpretation of the evidence pointing away from first degree murder—that is that it was not deliberate and premeditated." The court proceeded to summarize the evidence regarding the nature of the crime that pointed to first degree murder before concluding "it has been proven beyond a reasonable doubt that the degree of murder in this case is first degree murder." Viewed in context, the court's comments in no way show, as defendant contends, that it either misapplied the burden of proof or presumed first degree murder in reaching its decision. The court considered the circumstantial evidence and concluded it could not draw a

reasonable inference based on that evidence in defendant's favor on the issue of degree.

## DISPOSITION

The judgment is affirmed.


GOODING, J.

WE CONCUR:


MOORE, ACTING P. J.


DELANEY, J.