Filed 7/1/13  P. v. Baeza CA4/2

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

THE PEOPLE,

 Defendant and Appellant,

v.

ALEXANDRO ALFONSO BAEZA,

 Defendant and Appellant.

E054786

(Super.Ct.No. RIF10002194)

OPINION

APPEAL from the Superior Court of Riverside County.  Mark E. Johnson, Judge. Affirmed.

Nancy J. King, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Anthony Da Silva and Christopher P. Beesley, Deputy Attorneys General, for Plaintiff and Respondent.

1

A jury found defendant and appellant Alexandro Alfonso Baeza (defendant) guilty of murder in the second degree (Pen. Code, § 187, subd. (a)) in connection with the death of his two-year-old son, and guilty of assault on a child under eight years of age causing death (Pen. Code, 273ab). The trial court sentenced defendant on the assault causing death conviction to 25 years to life in prison and stayed execution of sentence on the murder conviction in accordance with Penal Code section 654.

In this appeal, defendant raises three claims of error. First, he contends the trial court's jury instruction on implied malice was incorrect, and the error was prejudicial. Next, defendant contends the trial court committed error by allowing the prosecutor to introduce irrelevant character evidence, namely, evidence that defendant was under the influence of methamphetamine at the time his son died and evidence that the child's mother had suspected defendant was physically abusing their son as evidenced by bruises on the child's ears. Finally, defendant contends the trial court violated his Sixth Amendment right to counsel when, at his sentencing hearing, defendant moved to dismiss his retained attorney and the trial court denied that motion.

We conclude defendant's claims are meritless. Therefore, we will affirm the judgment.

## FACTS

The facts are undisputed. On April 10, 2010, paramedics went to defendant's home in Moreno Valley in response to a 911 call. They found two-year-old Isaac Gallegos unresponsive and suffering apparent neurological impairment. The paramedics transported Isaac to Riverside County Regional Medical Center where doctors

2

immediately performed surgery to relieve pressure on his brain caused by a traumatic head injury. During surgery, Isaac suffered a massive hemispheric stroke. A large section of his brain was destroyed due to lack of blood flow. Isaac never regained consciousness. A CT scan performed the day after the surgery revealed that all of the child's brain tissue was abnormal. Isaac was declared brain dead. After his organs were donated, he was removed from life support. Blunt force trauma to the head was the cause of Isaac's death.

Isaac's mother, Andrea Gallegos, testified, in pertinent part, that defendant is Isaac's father. He had court ordered visitation with the child twice each week. On April 10, 2010, defendant picked up Isaac in the morning. Isaac did not want to go and started crying when defendant arrived. When he left with defendant, Isaac was healthy and behaving normally. Around 11:40 a.m., Gallegos sent a text message to defendant asking about Isaac. Defendant responded that the child had a runny nose but otherwise was fine. Around 6:15 p.m., defendant called Gallegos. He was screaming and said something was wrong with Isaac; he had fallen and was not breathing. Gallegos told defendant to call 911. Gallegos met defendant at the hospital. Isaac was already in surgery. Defendant told Gallegos that Isaac had fallen off a toddler bed.

When interviewed by the police on April 11, 2010, defendant initially denied that anything had happened to Isaac. Defendant said the child would not eat, and he had vomited about an hour after arriving at defendant's house. Then, a few hours later, Isaac again vomited. Defendant took Isaac into his daughter's bedroom, apparently to change his diaper. Isaac was lying on the daughter's bed. Defendant was gone "no more than

3

fifteen seconds" to get wipes, and when he came back, Isaac was standing on the floor. Defendant told the police he "was like, wait a sec, what happened, boy, what's wrong? He's standing on the floor. He looked fine." Defendant acknowledged that his daughter's bed is no more than two feet tall, "[n]ot tall at all."

When the police confronted defendant and told him Isaac's injuries were severe and inconsistent with defendant's suggestion that Isaac had fallen off a two-foot high bed, defendant denied the officer's suggestion that he had shaken Isaac or slammed him into something. Defendant then admitted that he had been trying to change Isaac's diaper after the child's first nap, and Isaac fell off the bed. He hit his head on the floor. Isaac's head hit the floor at a "weird angle," according to defendant. When the officers asked why defendant had not told them this initially, defendant responded, "Well, just, honestly, man, honestly I'm really, really like really, really scared, 'cause I mean I didn't even mean to do that at all. I mean he's really fragile, and I mean it did happen, and I did not slam him, though, officer. I did not slam him." Defendant then said, "When I was changing him, I was a little frustrated over the whole situation. I did not do it intentionally. He, he was laying on the bed. The diaper was coming—it was—it wasn't coming off, grabbed him a little bit, and then I just—I was gonna take off to go get the wipes, and I slammed right on the floor, boom, head first. I did not pick him up.

4

I promise you that."[1]  As the interview continued, defendant said, "I didn't do it hard.  I didn't do it hard, and that—that's just what happened.  That's what happened."  Later, defendant added that he caught Isaac as he fell, "I had to catch him up by his legs."  "Caught him," defendant said, "His body . . . [¶] . . . [¶] . . . on his upper side—on his upper side is lose.  You know, it's not hard.  [¶] . . . [¶]  Caught him.  Boom.  Boom.  Just like that, really, really hard, man, really, really hard . . . ."

## DISCUSSION

### 1.

### JURY INSTRUCTION ON IMPLIED MALICE

The trial court instructed the jury according to CALCRIM No. 520.  To prove murder, "the People must prove that:  [¶]  (1)  The defendant committed an act that caused the death of another person;  [¶]  And (2) when the defendant acted, he had a state of mind called malice aforethought.  [¶]  There [are] two kinds of malice aforethought: Express malice and implied malice.  [¶]  . . . [¶]  Proof of either is sufficient to establish the state of mind required for murder.  [¶]  The defendant acted with express malice if he unlawfully intended to kill.  [¶]  The defendant acted with implied malice if:  [¶]  (1)  He intentionally committed an act;  [¶]  (2)  The natural and probable consequences of the act

---

[1]  The prosecutor showed the jury the videotape of the police interview of defendant.  We take our quotations from the transcript of the audio portion of the videotape that was introduced into evidence at trial.  We assume the transcript is wrong, and that defendant actually said, "Isaac slammed right on the floor, boom, head first."  And when defendant said he did not pick him up, he meant he did not pick up Isaac and slam him into the floor, as opposed to he did not pick the child up after he fell and hit his head.

were dangerous to human life; [¶] . . . [¶] (3) At the time he acted, he knew his act was dangerous to human life; [¶] And (4) he deliberately acted with conscious disregard for human life. Malice aforethought does not require hatred or ill will toward the victim. It is a mental state that must be formed before the act that causes death is committed. It does not require deliberation or the passage of any particular period of time."

During their deliberations, the jury sent a note asking, "Can #4 under implied malice, page 6, be further explained in regard to conscious disregard?" Over defendant's objection, the trial court responded, "Look at paragraph 6 of instruction 200 and apply the common meaning of these words. 'Conscious disregard' means the defendant was aware of the probable dangerous consequences of his conduct and that he willfully and deliberately failed to avoid the consequences."

## A.

### Response to Jury Question

Defendant contends the trial court's response to the jury's request for clarification of the phrase "conscious disregard" allowed the jury to find defendant guilty of murder based only on a finding that defendant knew his actions created a risk of serious bodily injury and, therefore, the trial court's response removed the required element that defendant be aware his conduct endangers the life of another. We disagree.

As defendant correctly states, second degree murder based on implied malice "requires a defendant's awareness of engaging in conduct that endangers the life of another—no more, and no less." (*People v. Knoller* (2007) 41 Cal.4th 139, 143.) The trial court's response to the jury's request for an explanation of conscious disregard does

6

not mention serious bodily injury. (Cf. *ibid*.) Moreover, the response must be considered in conjunction with the jury instruction to which it relates, namely CALCRIM No. 520 which, as quoted above, told the jury that implied malice requires conscious disregard for life. When viewed in context, the trial court's response can only mean that defendant was aware of the probable dangerous consequences his conduct posed to human life, and that he failed to avoid those consequences, i.e., he engaged in that conduct anyway.

**B.**

**CALCRIM No. 520**

As previously noted, defendant contends CALCRIM No. 520 is internally inconsistent because it requires proof that the defendant "deliberately acted with conscious disregard for human life" but then also states that the mental state of malice aforethought does not require deliberation. Defendant's claim incorrectly assumes "deliberately" and "deliberation" have the same meaning.

The term deliberation refers to the concept used in conjunction with premeditation that distinguishes first degree murder from second degree murder—first degree murder is, among other things, a killing that is willful, deliberate, and premeditated. (Pen. Code, § 189; *People v. Anderson* (1968) 70 Cal.2d 15, 25-26.) In that context, deliberation means """"formed upon a pre-existing reflection.""" (*Id*. at p. 26, italics omitted.) Second degree murder does not require premeditation and deliberation, as CALCRIM No. 520 correctly states. However, as previously discussed, second degree murder based on implied malice does require a deliberately performed act, committed with knowledge the

7

act poses a danger to life and with conscious disregard of that danger. In short, CALCRIM No. 520 is not internally inconsistent.

## 2.

## ADMISSIBILITY OF CHARACTER EVIDENCE

In a pretrial in limine motion, the prosecutor asked the trial court to rule on the admissibility of evidence that (1) defendant had physically abused Isaac at least one other time before the day the child died, as evidenced by photographs, taken after the child had been with defendant, which showed bruises on Isaac's ears; and (2) a blood sample taken from defendant at 3:32 a.m., on April 11, 2010, that tested positive for methamphetamine, which in turn meant defendant was under the influence of that controlled substance not only when the police interviewed him but also when Isaac was in his care.

The trial court found the prior abuse evidence admissible under Evidence Code section 1109, and further found the evidence was more probative than prejudicial. The trial court also ruled that the evidence defendant was under the influence of methamphetamine was relevant to explain defendant's state of mind at the time he gave his statements to the police, and the probative value outweighed the potential for prejudice. Defendant contends those rulings are both incorrect and resulted in prejudice. Again, we disagree.

8

## A.

### Standard of Review

We review a trial court's ruling on the admissibility of evidence under the abuse of discretion standard. (*People v. Geier* (2007) 41 Cal.4th 555, 586.) We will not disturb that ruling "'"except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice."'" (*Id.* at p. 585.)

## B.

### Methamphetamine Evidence

Defendant contends the evidence that he was under the influence of methamphetamine was inadmissible under Evidence Code section 1101, subdivision (a), which prohibits the use of evidence of a person's character or a character trait to prove that person's conduct on a specific occasion. As previously noted, the trial court ruled the evidence that defendant was under the influence of methamphetamine was admissible under Evidence Code section 1101, subdivision (b), on the issue of defendant's credibility when he was interviewed by the police. Defendant concedes the relevance and admissibility of the evidence for that purpose, but contends the probative value was substantially outweighed by its potential for prejudice, because "[t]he only plausible purpose for exposing the jury to that information was to cement in [the jurors'] mind[s] that [defendant] was a drug user, and therefore a criminal." In other words, defendant contends the court should have excluded the evidence under Evidence Code section 352.

We are inclined to agree with defendant that the probative value of the evidence that he was under the influence of methamphetamine was substantially outweighed by its potential for prejudice and, therefore, the trial court should have excluded that evidence. The prosecutor's evidence showed not only that defendant was under the influence at the time he was interviewed by the police, but also 12 hours earlier, while Isaac was in defendant's care. Moreover, the prosecutor did not argue in closing that defendant was under the influence of methamphetamine when he was interviewed by the police and, therefore, his credibility was questionable. He argued that the best case scenario was defendant "took methamphetamine just hours before he picked up Isaac. Worst case scenario, he's taking methamphetamine throughout the day that he's caring for Isaac."

Although we conclude the trial court should have excluded the evidence in question, we also conclude the error was not prejudicial, in that it is not reasonably probable the jury would have reached a result more favorable to defendant if they had not heard the evidence that defendant was under the influence of methamphetamine while Isaac was with him.[2] In arguing prejudice, defendant contends that defendant's prior abuse of Isaac and his drug use accounted for a substantial part of the prosecution's case. The record does not support that claim, at least with respect to the drug use evidence.

---

[2] We do not share defendant's view that the error is subject to review under the "harmless beyond a reasonable doubt" standard of *Chapman v. California* (1967) 386 U.S. 18, because it violated his federally protected constitutional right to due process and against self-incrimination. Defendant does nothing more than make the assertion; he does not explain how the erroneously admitted evidence violated his rights.

10

Moreover, defendant's prejudice argument focuses entirely on the evidence of prior abuse, the admissibility of which we now discuss.

## C.

### Prior Abuse Evidence

Evidence Code section 1109, subdivision (a)(1), states in pertinent part that "in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352."

The trial court, as noted previously, allowed the prosecution to present evidence in the form of testimony from Isaac's mother that Isaac had bruises on both ears after one of his visits with defendant. Gallegos and her parents took photographs of the bruises, and those photographs were introduced into evidence at trial. Defendant objected to the admissibility of that evidence on the ground, first, that it had not been established that red marks depicted in the photographs actually were bruises and, in any event, there was no evidence to show defendant had caused the bruises.[3]

---

[3] Dr. Clare Sheridan-Matney, a pediatrician and child abuse expert, testified, among other things, that bruises on a child's ear are rarely the result of an accident: "ear bruises are very much associated with child abuse or inflicted injury or somebody hitting the ear." Because "it's really hard to conceive of a scenario where a child could accidently bruise both ears at the same time," bruises on both ears are "a very common finding in child abuse, where the people are frustrated with babies or toddlers and they hit them on the side of the head."

11

We cannot say the trial court clearly abused its discretion by admitting evidence that Isaac had bruises on his ears after a visit with defendant. But even if we were to conclude otherwise, we cannot say the error resulted in prejudice, i.e., a reasonable probability the jury would have reached a result more favorable to defendant. The jury's guilty verdicts in this case did not turn on evidence that defendant might have abused Isaac on other occasions, or that he might have been under the influence of methamphetamine. They are the result of the evidence that in his statement to the police, defendant initially lied about how Isaac's injury occurred and then admitted he had been involved but purportedly only in an attempt to prevent the child from falling off the bed. By defendant's own description, the bed in question was only two feet high.[4] Each of the three expert witnesses who testified at trial[5] said Isaac's injuries could not have been caused by a fall from a height of two feet. The damage to Isaac's brain was severe and extensive, equivalent to injuries that typically occur in car accidents; "[i]t's a high-impact injury."

In short, the jury convicted defendant of second degree implied malice murder based on defendant's statement to the police and the evidence of the extensive injuries

---

[4] The prosecutor showed the jury photographs of the bed from which defendant claimed Isaac had fallen. In his closing argument, he described the bed as being about eight inches high.

[5] Dr. Blake Berman, the neurosurgeon who operated on Isaac, Dr. Sheridan-Matney, and Dr. Mark Fajardo, the forensic pathologist who conducted the autopsy on Isaac, are the expert witnesses who testified at trial.

Isaac suffered. It is not reasonably probable, i.e., there is no "reasonable chance,"[6] the jury would have reached a result more favorable to defendant if the trial court had excluded the evidence that Isaac had bruises on his ears when he came home from a visit with defendant. Accordingly, we must reject defendant's contrary claim.

## 3.

## RIGHT TO DISCHARGE RETAINED COUNSEL

At his sentencing hearing, defendant moved to discharge his retained attorney. Defendant also asked the trial court to appoint a new attorney to represent him and to continue his sentencing hearing. The trial court denied those requests, first noting that defendant's sentencing hearing had already been delayed a month, from September 22 to October 21, at defendant's request. The trial court concluded defendant's request to discharge his attorney was made for the purpose of delay because defendant had not mentioned any dissatisfaction with his attorney when he made his first continuance request, and defendant waited to make this motion until just moments before he was to be sentenced. Therefore, the trial court denied defendant's motion to discharge his attorney.

Defendant challenges that ruling, claiming the trial court effectively forced him to choose between representing himself or continuing with the retained attorney he wanted to fire, and thereby deprived defendant of his right and/or ability to file a new trial motion. We disagree.

---

[6] *College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 715, citing *People v. Watson* (1956) 46 Cal.2d 818, 837 ["'probability' in this context does not mean more likely than not, but merely a *reasonable chance*, more than an *abstract possibility*"].)

The pertinent legal principles are undisputed. The Sixth Amendment right to the effective assistance of counsel includes the right of a nonindigent defendant to be represented by retained counsel of the defendant's choice. (*People v. Gzikowski* (1982) 32 Cal.3d 580, 586.) "[A] defendant—whether indigent or not—who seeks in a timely manner to discharge retained counsel, ordinarily should be permitted to do so." (*People v. Ortiz* (1990) 51 Cal.3d 975, 981.) In other words, a defendant's right to discharge retained counsel "is not absolute. The trial court, in its discretion, may deny such a motion if discharge will result in 'significant prejudice' to the defendant [citation], or if it is not timely, i.e., if it will result in 'disruption of the orderly processes of justice' [citations]." (*Id.* at p. 983.)

Here, the trial court found defendant's request to discharge his attorney was untimely and was raised for the purpose of delaying his sentencing hearing. The facts the trial court cited, as set out previously, support that finding. The trial court offered to grant defendant's request, if defendant represented himself at the sentencing hearing, but defendant declined that offer, insisting instead that he was innocent and needed a new attorney to make various unspecified motions his current attorney had refused to make. As the trial court correctly noted, defendant did not mentioned any issues with his attorney when he appeared in court a month earlier to request a continuance of his sentencing hearing, nor did he attempt to raise that claim at any time before the day of his sentencing hearing. Under these circumstances, we must conclude the trial court did not abuse its discretion in denying defendant's motion to discharge his retained attorney,

14

appoint new counsel, and continue the sentencing hearing, purportedly to enable newly retained counsel to file a new trial motion. (*People v. Ortiz*, *supra*, 51 Cal.3d at p. 983.)

**DISPOSITION**

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
                                                    Acting P.J.

We concur:


RICHLI
                    J.


KING
                    J.

15