Filed 1/14/15  P. v. Le CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>LAN ANH LE,<br><br>        Defendant and Appellant. | C072488<br><br>(Super. Ct. No. 10F01589) |

Defendant Lan Anh Le stabbed her girlfriend, Monica Anderson, approximately 91 times.  A complaint deemed information charged defendant with murder and personal use of a knife.  (Pen. Code, §§ 187, subd. (a), 12022, subd. (b)(1).)[1]  A jury found

---

[1]  All further statutory references are to the Penal Code unless otherwise designated.

1

defendant guilty of first degree murder and found the section 12022 allegation true. Sentenced to 25 years to life plus one year in state prison, defendant appeals, arguing the evidence is insufficient to support the jury's finding that she premeditated and deliberated prior to killing Anderson. We shall affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Early on a March morning in 2010 defendant stabbed her girlfriend, Anderson, and was subsequently charged with murder and personal use of a knife. Prior to trial, defendant was found to be mentally incompetent under section 1368 and was committed to Napa State Hospital. Seven months later, following a two-day hearing, the trial court determined defendant was competent to stand trial. A jury trial followed. Since defendant challenges the sufficiency of the evidence to support her conviction, we provide a detailed description of the evidence presented at trial.

**Ryan Millwee's Testimony**

Ryan Millwee and Anderson were friends who had met at an auto parts store no more than a couple of months before the murder. Anderson introduced defendant to Millwee.[2]

On the evening before the murder, Millwee was at a tattoo shop when he received a call from Anderson. Later that evening, Anderson and defendant came to the tattoo shop. Millwee was surprised to see them together because Anderson had told him she was not seeing defendant anymore. The trio left the tattoo shop and went to a liquor store, where they purchased a liter of vodka and some orange juice. After they returned to the tattoo shop, Anderson suggested they go to her apartment. According to Millwee, they were all in a good mood.

---

[2] Millwee admitted to a conviction of possession of heroin for sale in 2006.

2

At the apartment, the three started drinking and each did a couple of lines of cocaine. All told, the trio drank about three quarters of the liter of vodka and used half a gram of cocaine. The group became relaxed and began discussing Anderson and defendant's relationship. Millwee believed the relationship between the two was almost over, but since defendant was going to spend the night, "obviously something was there."

As they continued to drink, defendant became agitated and Anderson started talking about other people. Defendant's mood shifted from laughing to being serious to being "pissed off." Millwee thought defendant was jealous, and both women made "snippy" comments to one another. Many of the comments Millwee did not understand.

Defendant began drinking straight from the bottle and was becoming angry. The more defendant drank, the more her anger came out. Anderson made it clear the relationship with defendant was ending, and defendant reacted with jealousy and rage. Millwee testified defendant was "trying to hold onto [*sic*] something that was leaving."

Twice defendant told Millwee to leave, but Anderson told him to stay. Millwee stayed, which might have irritated defendant. Defendant stated she knew Millwee and Anderson had been hanging out with each other and accused them of sleeping together. Millwee denied the allegation. According to Millwee, the room was full of tension and anger. He tried to placate defendant, cautioning Anderson not to exacerbate the situation.

Around 2:00 a.m., defendant became calmer and went outside to smoke a cigarette. Millwee left but told Anderson to call if anything happened. Five minutes after he left, Millwee's cell phone rang. No one responded when he answered, so Millwee called the number right back. When the call was answered, Millwee heard screaming and "chaos," the sounds of a fight. As he listened, the noises diminished.

In a panic, Millwee quickly returned to the apartment. As he approached the apartment, he saw Anderson lying on the ground with her eyes open, "feet to feet" with defendant, with a knife beside her. Defendant appeared to have fallen over from

3

exhaustion.  Millwee kicked the knife away.  Defendant began to move, and Millwee grabbed her and pinned her down.

**George P.'s Testimony**

The night of the murder, 14-year-old George P., who lived in Anderson's apartment complex, heard screaming and yelling and the word "stop."  As he looked out the window, George saw Anderson running down the stairs followed by defendant, who was armed with a chef's knife in her hand.  He testified defendant appeared calm as she chased Anderson.

George testified that when Anderson got to the bottom of the stairs, she stopped and tried to calm down defendant.  Defendant stabbed Anderson, who fell to the ground.  Defendant then dropped down on her knees and began stabbing Anderson repeatedly, holding the knife with both hands.  As defendant stabbed Anderson again and again, the victim continued to beg defendant to stop.  After a few minutes, Anderson died.  Defendant continued to stab Anderson's body until she grew tired.  Defendant then remained sitting next to Anderson's body.  Not long after, a man approached, took the knife from defendant, and held her down until the police arrived.

**Victor Garcia's Testimony**

Another resident of Anderson's apartment complex was inside a downstairs apartment when he heard someone screaming "stop."  Garcia left the apartment and saw defendant come out of another apartment, armed with a kitchen knife.  His neighbor, Anderson, was nearby at the top of the stairs.  Anderson ran down the stairs, yelling "stop."  Defendant chased her, yelling "bitch."  Garcia saw defendant stab Anderson once or twice in the back, and he called the police.

Anderson fell to the ground at the bottom of the stairs.  Defendant got on top of Anderson and stabbed her in the chest, stomach, and face.  As she stabbed Anderson, defendant continued to yell "bitch."  The stabbing continued for about three minutes, until defendant got tired.  Defendant lay on the ground and let the knife fall.  A man came

4

up to defendant and said, "look what you did, you killed her," and told defendant she was going to jail. In response, defendant said, "shut up, bitch," and began to argue with the man. The parties stipulated that after officers arrived at the scene, defendant said, "what about my shoes and purse? Shit, just because I killed someone, I don't get my stuff. I guess I'm going away for life."

**Coroner's Testimony**

Dr. Elizabeth Albers, a forensic pathologist with the coroner's office, met with defendant at the police department. She examined scratches on defendant's hand and wrist, and some injuries on her chest. Defendant claimed the chest injuries were self-inflicted using the knife found at the murder scene. Dr. Albers asked defendant if she had been in a fight, and defendant replied that she just wanted to get her charger and one thing led to another.

Dr. Albers performed the autopsy on Anderson and determined the cause of death was multiple stab wounds. The autopsy revealed stab wounds to Anderson's neck, shoulders, and back, and blunt force injuries to the neck. Three stab wounds penetrated her chest cavity and caused lung injury, and there were multiple stab wounds to her face and neck. Many stab wounds that entered Anderson's chest cavity caused injury to her heart, aorta, and liver. According to Dr. Albers, the injuries to Anderson's heart and aorta were fatal. Dr. Albers also found bruising to Anderson's face, arms, and legs, and petechial hemorrhages in the right eye, commonly seen with strangulation.

**Crime Scene Observations**

Officers found Anderson lying at the foot of a staircase to the second-floor apartment. There were blood drops on the ground; a knife was off to the side, as well as debris from a broken cell phone. The trail of blood began at the apartment, with blood on an interior wall of the apartment next to the door and blood next to the doormat. There were blood smears or swipes on the staircase wall and on the staircase.

5

Defendant left her jacket, shoes, and purse inside Anderson's apartment. Officers also found a three-quarters-empty vodka bottle. A phone cord lay next to the front door, and a phone charger was in Anderson's bedroom. Another phone charger was in the living room with a single strand of hair entwined in the cord.

**Defendant's Interview**

Five hours after the murder, Detective Ronald Pfleger interviewed defendant; the interview was played for the jury. Defendant admitted stabbing herself above her breast. Defendant said she wanted to kill herself after killing Anderson.

Defendant told Pfleger that Anderson was the love of her life and they had an intimate relationship. They had been a couple for about a year when things became off and on. Defendant ceased trusting Anderson after she began hearing things. Anderson had lied to defendant about sleeping with a friend of Millwee's earlier that year. Although defendant said the couple had broken up, they still had feelings for each other.

The evening of the murder began well. Anderson picked up defendant and they saw Millwee at the tattoo shop. They all went to Anderson's apartment, where they drank vodka and did several lines of cocaine.[3] According to defendant, Millwee and Anderson were pushing her buttons. She believed Anderson was attracted to Millwee, although Anderson denied it. They seemed to be playing "mind games" with her, which made her upset.

Defendant asked Millwee to tell her the truth, and he jokingly said he had slept with Anderson. Anderson took Millwee's side. Defendant believed the pair were talking behind her back and she started feeling "weird." Millwee became rude and defendant told him to leave. Millwee initially stood up to defendant, but ultimately he left.

---

[3] The first 911 call was made at 2:34 a.m. A toxicology screen taken at 4:15 a.m. revealed defendant's blood alcohol content at .14 percent. The screen also showed cocaine in defendant's system.

Defendant and Anderson began to argue over defendant's phone charger. Anderson did not want defendant to use the charger, and things got violent. Defendant tried to get the charger, but Anderson said defendant was strangling her because the cord was around her neck. The room was dark and defendant was unaware she was hurting Anderson. They fought over the charger and defendant finally took it.

Over defendant's objection, Anderson called Millwee. Defendant became angrier and told Anderson she did not want Millwee to return because she considered him a threat. If Anderson had not called Millwee, "[e]verything would have been peaceful."

After calling Millwee, Anderson tried to leave the apartment. Defendant said Anderson "just ran out like she really wanted to be with him." Defendant was very drunk and angry, and she was not going to let Anderson go. Defendant went into the kitchen, opened a drawer, and grabbed a knife.

Later in the interview, defendant said that before picking up the knife, she thought about a video game, Grand Theft Auto: San Andreas, which she played almost daily. When asked what the game entails, defendant said, "just do missions, whatever. You know, kill people. You can kill whatever -- whoever you want. You can have [a sheet] that you can clear out your felonies or whatever." In the game, defendant was "the bad guy there and you just kill whoever you want," like gang members. Defendant thought it was this video game that made her "think in that mindset." Defendant also said she did not think much about what she was doing and that she was drunk. According to defendant, "[i]t was just stupid, me doing that, and I have no excuse for what I was doing. I just felt so mad that like I had so much things built in that . . . I know that I have an anger issue. Like I never really got helped right, and depression . . . ." She was angry and felt "really delirious." She knew "every part of it was wrong," but she wished Anderson had not called Millwee.

7

When asked why she had killed Anderson, defendant said she was not in her right state of mind. Defendant did not know why she had even thought about killing Anderson but admitted she was at fault.

Defendant began stabbing Anderson as Anderson ran away from her. As Anderson ran down the stairs, defendant caught up with her. She began stabbing Anderson in the back, and after Anderson fell she stabbed her in the front. Defendant stabbed Anderson "[j]ust anywhere I could." Anderson tried to fight back and begged defendant to stop, but defendant "didn't stop, cause with me, I don't listen to -- I don't really listen to a lot of people because . . . I've been through a lot in my whole life that I don't just trust anybody." As Anderson lay on the ground, defendant continued to stab her, but "then she was gone." Defendant tried to kill herself, but it hurt too much.

Millwee then appeared and defendant said he "was all like, what the fuck are you doing? Blah, blah, blah . . . ." Millwee took away the knife and got her on the ground. Defendant said Millwee was rude to her.

**Evidence of Prior Assault**

The prosecution introduced evidence, under Evidence Code section 1109, of a 2009 assault by defendant against Anderson. Anderson's mother testified that on the day of the assault, a crying Anderson had called her. Anderson told her mother defendant had beaten her. Anderson came to her mother's house with a bloody nose and an abrasion on the side of her face.

Anderson told her mother she had been home lying down and defendant was on the phone. Defendant was talking about an argument she and Anderson had about defendant moving out of the apartment. Defendant hung up, got on top of Anderson, and began hitting her in the face. Anderson managed to extricate herself and ran to a neighbor's apartment.

Anderson's mother took her to the police department, where Anderson gave a statement. They then went to the hospital. Anderson's injuries included a broken nose,

8

multiple abrasions, and swelling and bruising around her eye.  Too afraid to return to her apartment, Anderson stayed with her mother.  Defendant called and apologized, but Anderson's mother hung up on her.

**Defense Case**

### *Lori Huhtala*

Lori Huhtala, a child care group counselor, met defendant in 2008.  Defendant was in a group home that cared for children with drug or alcohol abuse problems.  Defendant did well in the group home and participated in anger management classes.  Defendant left the group home when she "[a]ged out."  However, Huhtala did not believe defendant was ready to leave and be on her own.

Defendant's life skills were sufficient, but Huhtala believed defendant did not have family support.  Family did not visit defendant in the group home or help her financially.  Huhtala stayed in touch with defendant and had met Anderson twice.  She knew they were a couple.

In 2009 or 2010 Huhtala, defendant, and a woman named April went to a lake.  While at the lake, defendant received numerous phone calls, causing her stress.  Each time defendant explained where she was.  The caller was Anderson, and after Huhtala explained that she was with defendant, Anderson appeared placated.  They left the lake and went to Huhtala's house, and Anderson called defendant while they were there; again, defendant became stressed.

After she was arrested, defendant called Huhtala.  Defendant told her that she and Anderson had gotten back together, but then Anderson went behind defendant's back.  Defendant said she did not want anyone else to have Anderson.  Huhtala asked defendant if she had stabbed Anderson 30 to 40 times, but defendant said that was an exaggeration.  She admitted using alcohol and cocaine the night of the murder.

### *Perry Knight's Testimony*

Perry Knight, a friend of the couple, testified that Anderson and defendant had a passionate relationship. The couple argued about small things, and Knight thought there were some issues with jealousy. Knight often acted as a mediator, and Anderson would respond by making light of the situation, which bothered defendant. According to Knight, defendant suffered from mood swings and could become angry over little things. His relationship with the couple ended in 2009 when he told them it would probably be better if Anderson and defendant broke up.

### *Dr. Gregory Sokolov's Testimony*

Dr. Gregory Sokolov, an expert in forensic psychiatry, interviewed defendant after her arrest. Dr. Sokolov diagnosed defendant as suffering from three psychiatric conditions on the day of the murder: alcohol intoxication, cocaine intoxication, and personality disorder not otherwise specified with borderline traits. The personality disorder is characterized by a pervasive pattern of instability in interpersonal relationships. The condition usually begins during adolescence and affects thoughts, emotions, impulse control, and world view.

A person suffering from borderline personality disorder, in stressful situations, misperceives things and can become angry. Symptoms of the disorder include frantic efforts to avoid abandonment, unstable self-image, recurrent suicidal or self-mutilating behavior, impulsivity that is potentially self-damaging, affective instability due to a marked reactivity of the mood, chronic feelings of emptiness, inappropriate intense anger or difficulty controlling anger, frequent displays of temper, and paranoid ideation.

Dr. Sokolov based his diagnosis of personality disorder on defendant's unstable and intense interpersonal relationships. Defendant also demonstrated impulsivity in areas including substance abuse, suicidal and self-mutilating behaviors, difficulty controlling anger, and "transient stress related paranoid ideations."

According to Dr. Sokolov, defendant demonstrated these transient stress related paranoid ideations on the night of the killing. Dr. Sokolov took into account the fact that defendant told police Anderson and Millwee were playing mind games with her and she believed the two of them were talking behind her back. Defendant also had the paranoid idea that Millwee and Anderson were in a relationship, which was an ideation based in reality but misinterpreted. When Dr. Sokolov interviewed defendant she told him she felt like she was not Anderson's girlfriend anymore and that Anderson was making her hang out with people she did not like. Defendant felt kidnapped and Anderson threw it in her face, frustrating her.

Because defendant exhibited a paranoid belief, Dr. Sokolov concluded that the night of the murder her decision making was not grounded in reality. Defendant's impulsivity resulted in a lack of weighing consequences, worsened by her drinking. Dr. Sokolov based his opinions on his interview with defendant, the facts and circumstances of the offense, defendant's statement to police, and records and reports.

Dr. Sokolov also testified regarding defendant's background. Defendant was the eighth of 10 children and her mother may have had mental health issues. Defendant's parents abused her and her siblings. Child Protective Services had been referred to the home 24 times. The most recent referral was for sexual abuse by defendant's 24-year-old brother on her 17-year-old sister. Such a chaotic upbringing was consistent with a person who had borderline personality traits.

Defendant first saw a psychiatrist at age 16. When she was 17 she was hospitalized, which is typical for the onset of a personality disorder. In addition, Dr. Sokolov's review of the record revealed defendant cutting herself to relieve stress, suicide attempts, physical and sexual abuse by a boyfriend, and an assault on her sister with a piggy bank that resulted in her sister needing three staples to her head. Following the assault, defendant became a ward of the court and was placed in a group home.

11

When she was 15 defendant began using drugs, including crystal methamphetamine, marijuana, Ecstasy, opium, and mushrooms.

While in the group home, defendant was diagnosed with posttraumatic stress disorder, for which she was proscribed Prozac. A 2008 court report stated defendant vacillated in the group home between acceptance and adherence to the program, and self-defeating behaviors and poor decision making. Dr. Sokolov found this consistent with borderline personality disorder. In addition, Dr. Sokolov referenced a 2011 psychiatric assessment that noted traits consistent with borderline personality disorder, including emotional instability, cutting, and an inability to control anger.

During cross-examination, Dr. Sokolov testified that on the night of the murder, defendant was able to make her own decisions, and in the aftermath she demonstrated goal-oriented behavior. Defendant spent six months in a mental hospital, where the staff diagnosed her as malingering in addition to a diagnosis of borderline personality traits. However, in Dr. Sokolov's opinion, defendant did not malinger her symptoms.

**Verdict and Sentencing**

The jury found defendant guilty of first degree murder and found true the section 12022, subdivision (b)(1) allegation. The court sentenced defendant to an indeterminate term of 25 years to life on count one, to run consecutively to the one-year term imposed on the section 12022 allegation. Defendant filed a timely notice of appeal.

**DISCUSSION**

Defendant challenges the sufficiency of the evidence supporting her conviction for first degree murder. According to defendant, "There is no evidence that she weighed and considered the question of killing and the reasons for and against such a choice and, having in mind the consequences, decided to and did kill." Since the evidence was constitutionally insufficient to support a finding of premeditation and deliberation, defendant argues her murder conviction must be reduced from first degree to second degree murder.

12

Section 189 provides: "All murder which is perpetrated by means of a destructive device or explosive, a weapon of mass destruction, knowing use of ammunition designed primarily to penetrate metal or armor, poison, lying in wait, torture, or by any other kind of willful, deliberate, and premeditated killing . . . is murder of the first degree. All other kinds of murders are of the second degree."

The court instructed the jury with CALCRIM No. 521: "The defendant is guilty of first degree murder if the People have proved that she acted willfully, deliberately, and with premeditation. The defendant acted *willfully* if she intended to kill. The defendant acted *deliberately* if she carefully weighed the considerations for and against her choice and, knowing the consequences, decided to kill. The defendant acted with *premeditation* if she decided to kill before completing the acts that caused death.

"The length of time the person spends considering whether to kill does not alone determine whether the killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances. A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time. [¶] . . .[¶]

"The number of stab wounds alone does not prove premeditation and deliberation, but is a factor for your consideration along with all the other evidence supporting premeditation and deliberation."

To determine the sufficiency of the evidence in support of a conviction, we review the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Romero* (2008) 44 Cal.4th 386, 399.) We must accept logical inferences that

13

the jury might have drawn from the evidence, even if we would have reached a contrary conclusion.  (*People v. Streeter* (2012) 54 Cal.4th 205, 241.)

We do not reweigh the evidence.  " 'Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.'  [Citation.]  Unless it describes facts or events that are physically impossible or inherently improbable, the testimony of a single witness is sufficient to support a conviction.  [Citation.]"  (*People v. Elliott* (2012) 53 Cal.4th 535, 585.)

Three types of evidence are commonly found in cases involving premeditated murder:  planning activity, preexisting motive, and manner of killing.  The Supreme Court in *People v. Anderson* (1968) 70 Cal.2d 15 (*Anderson*) provides a framework for reviewing the sufficiency of the evidence supporting a finding of premeditation and deliberation.  The *Anderson* court's goal was to aid reviewing courts in assessing whether the evidence supports an inference that the killing was the result of preexisting reflection and weighing of considerations rather than mere unconsidered or rash impulse.  However, *Anderson* did not purport to establish an exhaustive list that excludes other types of evidence that could support a finding of premeditation and deliberation.  (*People v. Solomon* (2010) 49 Cal.4th 792, 812-813.)

Planning activity may be reflected in evidence "about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing."  (*Anderson*, *supra*, 70 Cal.2d at pp. 26-27.)  Motive refers to evidence "about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, [combined with planning activity or the preconceived design to kill], would in turn support an inference that the killing was the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than

14

'mere unconsidered or rash impulse hastily executed' . . . ." (*Id.* at p. 27.) Last, "facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take [her] victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of" planning activity and motive. (*Ibid.*)

Defendant argues the record is devoid of any planning activity, pointing out that she simply walked into the kitchen and grabbed a knife without selecting any particular weapon. As for motive, although defendant was jealous of Anderson and angry about her relationship with Millwee, this motive was "more consistent with sudden rage or fury than with slower simmering." Defendant contends her postkilling conduct was completely inconsistent with careful thought or a deliberate plan, since she did not try to flee or hide.

Nor does the manner of killing, according to defendant, show the murder was part of a preconceived design to take Anderson's life: "Here, [defendant] randomly, violently and indiscriminately stabbed Anderson 91 times, in a wild frenzy, all over her body, in the front and back, screaming 'bitch' with each thrust." Defendant did not aim for Anderson's vital organs. In addition, defendant states that strong, uncontradicted evidence indicates she killed Anderson on impulse due to borderline personality disorder traits. Therefore, the only reasonable inference to be drawn from the facts is that defendant killed Anderson because of "a combination of borderline personality traits, alcohol intoxication, cocaine intoxication, and unconsidered impulse, rather than of a deliberate judgment or plan coolly and steadily carried out according to a preconceived design."

We disagree. Defendant overlooks or minimizes evidence of deliberation and premeditation in her murder of Anderson. During her lengthy interview with detectives, defendant mentioned a video game called Grand Theft Auto: San Andreas that she played daily. She was thinking about the video game before she picked up the knife.

15

The game involves players killing whomever they want to and is very violent. Defendant thought the video game made her "think in that mindset." Defendant points out that these statements were made during a long interview and that she also referenced anger, depression, posttraumatic stress disorder, and alcohol consumption among other reasons for her actions. While the evidence of planning was not extensive, the fact remains that defendant discussed a violent video game involving murder as part of her mindset when she set out to get the knife from the kitchen, reflecting some degree of premeditation.

As for motive, despite defendant's efforts to minimize her feelings of anger and jealousy, both her own statements and Millwee's testimony show that she was very angry and jealous of the victim. Prior to the stabbing, defendant and Anderson fought over the phone charger, a fight which got "a little violent." Anderson's phone call to Millwee exacerbated defendant's anger, and according to defendant, if it were not for the phone call she would not have thought about getting the knife. Anderson ran out of the apartment, and defendant thought Anderson "really wanted to be with [Millwee]." Faced with the prospect of Anderson's leaving to go to Millwee, defendant walked into the kitchen, got the knife, and overtook Anderson. In a later jailhouse phone call, defendant stated she killed Anderson because she did not want anyone else to have Anderson. These events took place over a period of time, not necessarily reflective of a sudden rage or fury, but of a simmering anger that burst out lethally as events unfolded.

Defendant also stresses that she killed Anderson on impulse because of borderline personality disorder traits. At trial, Dr. Sokolov testified about defendant's mental state and his diagnosis of her. Defense counsel stressed this testimony at trial, and the jury could have accepted it and returned a different verdict—but it did not. Our task on appeal is not to comb the record for evidence contrary to the jury's verdict or to speculate on why the jury chose to accept or reject the testimony presented. Rather, a verdict will not be reversed for insufficient evidence unless it appears that upon no hypothesis whatever is there sufficient substantial evidence to support the verdict rendered.

16

(*People v. Bolin* (1998) 18 Cal.4th 297, 331.)  Viewing the entire record in the light most favorable to the verdict, we find reasonable credible evidence from which the jury could find that defendant killed Anderson deliberately and with premeditation.

## DISPOSITION

The judgment is affirmed.

                                             _____RAYE_____, P. J.


We concur:


_____BUTZ_____, J.


_____MAURO_____, J.