Filed 2/24/15  P. v. Brooks CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>HARVEY BROOKS,<br><br>        Defendant and Appellant. | B249724<br><br>(Los Angeles County<br>Super. Ct. No. KA092110)<br><br>ORDER MODIFYING OPINION<br><br>[No Change in Judgment] |

THE COURT:

It is ordered that the opinion filed herein on January 29, 2015, be modified in the following manner:

In the third paragraph on page 2, the entire sentence beginning with "And, finally, with regard to the transcripts" shall be deleted and replaced with the following two sentences:

With regard to the transcripts supplied to the jury, it is not reasonably probable that Brooks would have obtained a more favorable result absent those notations.  Finally, we conclude that even when viewed cumulatively the foregoing errors do not require reversal of Brooks' conviction under any standard of prejudice.

This modification does not constitute a change in the judgment.

<u>NOT TO BE PUBLISHED</u>.


_____

ROTHSCHILD, P. J.        CHANEY, J.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>HARVEY BROOKS,<br><br>    Defendant and Appellant. | B249724<br><br>(Los Angeles County<br>Super. Ct. No. KA092110) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  George Genesta, Judge.  Affirmed.

Lynda A. Romero, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, William H. Shin and Corey J. Robins, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Defendant Harvey Brooks killed his girlfriend Marshell Landry in the early morning hours at the Deluxe Motel in Pomona.  Brooks admitted that he killed Landry but claimed he did so in self-defense.  A jury disagreed and convicted Brooks of first degree murder.

In his opening brief on appeal Brooks argued that there was insufficient evidence to support the jury's finding of premeditation and that the court erred in responding to a question from the jury regarding express and implied malice.  We asked the parties to brief two other issues:  (1) Did the court err in admitting hearsay statements by Brooks' son?  (2) Was defense counsel negligent in not objecting to extrajudicial notations written on transcripts of telephone conversations supplied to the jury?

We conclude that there was sufficient evidence to support the jury's finding of premeditated murder.  We further conclude that even if the court erred in admitting Brooks' son's hearsay statements to Detective Shope, the error was not prejudicial.  We agree that the court did not give a pertinent answer to the question submitted by the jury but, again, because of the strong evidence of planning and the manner of the killing, we cannot say the error was prejudicial.  And, finally, with regard to the transcripts supplied to the jury, it is not reasonably probable that Brooks would have obtained a more favorable result absent those notations.

## FACTS AND PROCEEDINGS BELOW

### A.     The People's Case

Landry was a prostitute who worked the streets in Pomona.  Landry met defendant Brooks on a "date" and began living with him.  She introduced Brooks to her friends as her boyfriend.

On a Sunday morning in October 2010 at approximately 2:00 a.m., Brooks and Landry were in their motel room smoking crack cocaine with Vanessa Mayham, Denise Green and others.

Mayham testified that she never heard Brooks threaten Landry, and that as far as she knew, there was no physical abuse in their relationship.  She had noticed, however,

2

that after Brooks lost his job, Landry had to revert to prostitution to support them both. Landry's attitude toward Brooks changed as it seemed she "didn't want to be bothered" with him and they argued in Mayham's presence. On the morning in question she was smoking crack with Landry but Brooks was only given a little to smoke and he was upset about it. He asked Landry for money but she refused and told him to get his own money. At one point Brooks said something to Landry and she told him to "shut up." The people in the room were generally ignoring Brooks and he looked embarrassed and angry and was crying. Mayham left the room between 7:00 and 7:15 a.m. Landry was alive when she left.

Green testified that when she arrived at the motel room that morning Brooks was lying on the bed crying. He appeared to be upset or angry and was "whispering things" to Landry.

When asked what things Brooks whispered to Landry, Green responded: "He said he was going to kill her. Those was his exact words. . . . He whispered that to her and that's when she took her hand and shoved it over as if, you know, she shined it on." Green further testified that when Brooks was whispering to Landry he was sitting up with his back against the backboard and his legs stretched out and "I sat on the other side of the bed and no one else was on the bed but him and me and everyone else was sitting at a table around the table." The table was approximately three feet from the bed. Green said that she never saw Brooks with a weapon and she never saw Brooks and Landry act violently toward each other. When Green left the motel room that morning Landry was still alive. Green admitted that when the police interviewed her about the killing a few months after the event she did not tell them she heard Brooks whisper to Landry that he was going to kill her. She also admitted "the first time [she] told anybody that the defendant had threatened Ms. Landry was in court yesterday." Green explained she did not tell the police that she heard this threat because "I didn't want to be known as a snitch on the streets" and "I figured it was a cut and dry case." She changed her mind, she said, because "considering the situation, I felt it was the best thing to do."

3

In the evening of the day of Landry's killing, the Pomona police received two telephone calls from Brooks. The first call was to 911 in which Brooks stated that there had been a "fatal" accident at the Deluxe Motel and then hung up. In the second call, from a call box outside the police station, Brooks stated: "I would like to turn myself in. . . . My girlfriend and I got into an argument, and I hurt her real bad. . . . I lost my temper. And it's just something that's been building up a long time. You know . . . that's all. You know, I'm out front."

The police took Brooks into custody. He had cuts on both wrists and below his elbows. He told the police that he cut himself with a knife but did not know where the knife was. The emergency room doctor who treated Brooks testified that the wounds yielded mild to moderate bleeding and appeared to be self-inflicted in a "potential suicide attempt."

When officers responded to room 5 of the Deluxe Motel, they found Landry's body on the bathroom floor. Blood was on the sink, the floor and the walls. Brooks' fingerprint was on the sink. The officers also found dried blood on a folding knife but the DNA in the blood did not match Landry or Brooks.

A Coroner's investigator testified he examined Landry's body and that it bore an "apparent defense wound." Given the blood pattern in the bathroom, it was the investigator's opinion that the victim had moved during a struggle, or was moved back and forth in an attempt, possibly, to "rearrange her." The blood on the floor, he testified, "would indicate some kind of movement, struggle, automatic reaction to injury consistent with [a struggle]."

A deputy Medical Examiner testified that Landry suffered eleven knife wounds. She bore a fatal wound to her neck that cut through her left jugular vein, three fatal wounds to her upper back, a non-fatal chest wound, three non-fatal wounds to her upper back, and defensive wounds on her right hand. The fatal wounds were inflicted by someone standing behind her.

4

Prior to responding to the motel, Detective Richard Shope took a call from Brooks' adult son, Harvey Brooks, Jr. (Harvey) who lived in Texas. Harvey asked Shope "if there had been a murder." Shope did not answer directly because he was not yet familiar with the facts. Harvey told Shope that he was "concerned that [his father] may have hurt his girlfriend." Shope obtained Harvey's contact information and told him he would call him back when he knew more. He then joined the investigation at the motel.

The next day, Shope called Harvey who again expressed concern that his father may have hurt his girlfriend. In that conversation, which was recorded by Shope and played to the jury, Harvey told Shope about telephone calls that he recently received from his father.

The first call occurred the month before the killing. In that call Brooks said that he and Landry were "having problems," he was in a "bad way" and asked Harvey to send him money so that he could go to Georgia. When he and his father spoke again later his father told him: "[S]he's talking crazy, I just, I can't put up with her shit, she's stealing from me [and] I just need to get away before I end up hurting her." The third call came to Harvey at approximately 4:00 a.m. Central time the day of the murder. Harvey did not answer and the call went to his voice mail. When he listened to the message four hours later he heard his father say "by the time you get this, I [will] probably either be dead or in jail." Harvey said his father's voice sounded like he had "been in a fight or something." Harvey tried to call his father back all that day but his father did not answer.

Over Brooks' objection the prosecution also played recordings of telephone calls that Brooks made from jail to Harvey. In the first conversation Brooks tells Harvey he should "talk to Ron" and "he will tell you . . . what you should do." Harvey replies: "OK." In the second conversation, approximately three weeks later, Harvey tells Brooks "I talked to Ron. . . . I think I will be working. I don't think I will be able to make it down." Later in the conversation Harvey asks Brooks: "[I]f I was not working[, w]ould you want me to come down?" Brooks replies: "No, no. The thing is they're going to try to use your testimony against me anyways. . . . [I]f you're not there they can't use it, so

5

that's why. Everything is going to be alright." We discuss the contents of these calls in more detail below.

The person named Ron was not identified at trial.

Written transcripts of these conversations, but not the recordings themselves, were provided to the jurors and admitted into evidence.

**B.      The Defense Case**

Brooks, who had no prior criminal record, testified in his own defense.

He told the jury that he met Landry approximately four years earlier. He started out as one of her customers but they ended up living together and Landry stopped engaging in prostitution. When he lost his job, Landry started working the street again and they began arguing. Landry wanted Brooks to panhandle which he refused to do. She screamed at him and hit him on several occasions.

In the early morning hours of the day Landry was killed, Brooks and Landry were in their motel room with some friends smoking crack cocaine. Brooks was feeling high. He admitted that he was upset because Landry stated in front of their friends that she was "tired of me" and that she "was going to trade me in for someone else." Landry and her friends "were sitting around laughing about it." Brooks did not find it funny. At one point Brooks said something to Landry and Landry told him to "shut up."

After their friends left, Brooks tried to talk to Landry about the warning the motel manager gave him that if they didn't stop having so many people come to their room they would be evicted. Landry replied it was her room and if Brooks didn't like it he could leave and that she was tired of him anyway. Brooks told Landry that they had to change their ways. Landry told Brooks he had to leave and hit him on the left side of his face with her clenched fist. Landry then grabbed a knife lying on the dresser and came toward Brooks. Brooks grabbed Landry's arm and they wrestled over the knife. Eventually they fell into the bathroom. Brooks said he did not remember what happened next. He only remembered that when he stood up, he saw Landry lying on the floor and realized she

was badly hurt. "I lost it," Brooks testified. "I lost my temper. When she hit me, I snapped and—I don't remember what I did."

Brooks denied whispering to Landry that he would kill her. "I never said that," he told the jury. He did admit, however, that he told his son Harvey: "If I don't get away from her, I'm going to hurt her'" and that he had thought about hurting Landry "prior to actually doing it."

### C. The Deliberations and Verdict

The jury found Brooks guilty of first degree murder, rejecting the options of second degree murder, voluntary manslaughter and self-defense. The jury also found that in committing the crime Brooks personally used a dangerous weapon, i.e. a knife.

The court sentenced Brooks to a term of 25 years to life for the murder plus one year for the knife use.[1] Brooks filed a timely appeal.

## DISCUSSION

### I. SUFFICIENT EVIDENCE SUPPORTS THE JURY'S FINDING OF PREMEDITATION AND DELIBERATION.

Both parties agree that the three factors for determining the sufficiency of the evidence of premeditation and deliberation are: (1) planning activity; (2) motive; and (3) the manner of the killing. (*People v. Anderson* (1968) 70 Cal.2d 15, 26-27.) Considering those criteria we conclude that sufficient evidence supports premeditation and deliberation.

#### (1) Planning Activity

Denise Green testified that a few hours before the murder she was sitting on the bed next to Brooks and heard Brooks say that he was going to kill Landry. A few weeks before the murder Brooks told his son Harvey that he felt like he needed "to get away before I end up hurting her."

---

[1] The trial court corrected its award of presentence custody credits while this appeal was pending.

(2)     Motive

Brooks had a motive to kill Landry because he was ashamed that she had to resort to prostitution for their support and that she insisted that he panhandle, which he refused to do. In the hours before Brooks killed Landry, she was verbally abusive, demeaning and rude to him and he was visibly embarrassed and angry. Furthermore, Brooks told his son a few weeks before the murder that Landry was "talking crazy," he couldn't "put up with her shit," she was stealing from him and that a week before this conversation Landry "tried to have . . . a couple guys jump on him."

(3)     Manner of Killing

The evidence showed that Landry's throat was slit and her stomach stabbed by someone standing behind her. All of these fatal wounds were alike in their depth and length. Based on this evidence the jury could reasonably conclude that Landry's wounds were consistent with a premeditated murder and inconsistent with Brooks' claim that he accidently stabbed Landry while they were fighting over a knife.

## II.     EVEN IF THE COURT ERRED IN ADMITTING BROOKS' SON'S HEARSAY STATEMENTS TO DETECTIVE SHOPE, THE ERROR WAS HARMLESS.

As discussed above, statements that Brooks' son Harvey made to Detective Shope were important evidence in the prosecution's effort to show premeditation. **(See discussion *ante,* at pp. 5 & 8.)** In Harvey's conversations with Shope, Harvey recounted that a few weeks before the murder his father told him that Landry was "talking crazy," that he couldn't "put up with her shit," and that he needed "to get away before [he] end[s] up hurting her."

Harvey was unavailable as a witness because he declined to voluntarily come to California to testify and the prosecution's effort to subpoena him failed. Therefore, in order to introduce Harvey's hearsay statements to Detective Shope repeating what his father had said to him, the prosecution relied on the hearsay exception for

forfeiture-by-wrongdoing under Evidence Code section 1390.[2] This statute creates a hearsay exception for statements by a declarant whose unavailability as a witness has been intentionally caused by the wrongdoing of the party against whom the statement is offered.[3]

In a hearing outside the presence of the jury the prosecution played recordings of telephone calls that Brooks made from jail to his son Harvey to show that Brooks engaged in "wrongdoing" that caused Harvey's unavailability as a witness at Brooks' trial. (The recordings were later played to the jury as evidence of Brooks' consciousness of guilt and written transcripts of these conversations, but not the recordings themselves, were provided to the jury.) The court found that Brooks had procured Harvey's unavailability as a witness through wrongdoing and allowed into evidence Harvey's statements to Detective Shope in which Harvey reported his father's statements regarding Landry.

Brooks maintains there was insufficient evidence that he procured Harvey's absence from the trial through "wrongdoing" and that Harvey made up his own mind not to attend.

We need not address Brooks' argument because even without evidence of Brooks' statement to his son that he could "end up hurting" Landry, it is not reasonably probable that Brooks would have received a more favorable verdict on the degree of murder for the reasons discussed above. **(See discussion *ante*, at pp. 5 & 8.)** The

---

[2]     Brooks does not challenge the admissibility of his hearsay statements to Harvey. (See Evid. Code, § 1220 (party admissions); § 1230 (declaration against interest).)

[3]     Evidence Code section 1390 provides in relevant part: "(a) Evidence of a statement is not made inadmissible by the hearsay rule if the statement is offered against a party that has engaged, or aided and abetted, in the wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness. (b)(1) The party seeking to introduce a statement pursuant to subdivision (a) shall establish, by a preponderance of the evidence, that the elements of subdivision (a) have been met at a foundational hearing."

undisputed forensic evidence was particularly persuasive because it showed the killer stood behind Landry and slashed her throat and stabbed her in the stomach. This is not the way the fatal wounds would have been inflicted if, as Brooks testified, he and Landry were on the floor wrestling for the knife.

### III. THE ADMISSION OF THE TRANSCRIPT BEARING NOTATIONS APPARENTLY WRITTEN BY SOMEONE ON THE PROSECUTION TEAM WAS NOT PREJUDICIAL.

As discussed above, the jurors were given a written transcript of the telephone conversations between Brooks and Harvey concerning Harvey's coming to California to testify at Brooks' trial. The record shows that an unidentified person wrote comments on three pages of the transcript of these conversations and that those comments favored the prosecution's view of the evidence.

The note at the top of one transcript page reads: "Only I know what happened;" (bold and underlining omitted) a reference to Brooks' statement to Harvey: "Nobody knows what really happened in that room but me." "So unless I tell them what happened, it's all speculation." At the top of another page someone wrote: "Defendant does not want son to come." (Bold and underlining omitted.) This is a reference to Harvey's question to Brooks whether he should come to the trial and Brooks' answer: "No, no. . . . [T]hey're going to try to use your testimony against me." The third note reads: "Not wanting to come to California." (Bold and underlining omitted.) This is in reference to Harvey telling Brooks that he has been served with a subpoena to come to California for the trial and that he has to appear before a judge in Texas the next day. Harvey states that he doesn't think the judge will tell him he has to go to California because "[a]t the end of the day, I don't know shit."

The transcript bearing these comments was admitted without objection by defense counsel.

In any case, in light of the strong evidence supporting Brooks' deliberation and premeditation allowing the jury to view the notes on the transcripts was harmless. (**See discussion** *ante,* **at pp. 5 & 8**.)

10

**IV. THE COURT DID NOT GIVE A PERTINENT ANSWER TO THE QUESTION POSED BY THE JURY BUT THE ERROR WAS NOT PREJUDICIAL.**

The court instructed the jurors on express and implied malice utilizing portions of CALCRIM No. 520 including the directive that "[t]he defendant acted with *express malice* if he unlawfully intended to kill" and with implied malice if he "intentionally committed an act [and] the natural and probable consequences of the act were dangerous to human life." The court also instructed the jury under CALCRIM No. 521 that to prove Brooks guilty of first degree murder the People must prove "that he acted willfully, deliberately, and with premeditation" and that he acted willfully "if he intended to kill."

During their deliberations, the jurors sent a note to the court asking: "In order to be Murder 1, does the moment of express malice aforethought need to happen before the first fatal wound is delivered? In other words, can the malice begin as implied but turn into express along the way, and the charge would still be Murder 1?"

Before the court could gather the attorneys to discuss the question and the court's proposed answer, the jurors informed the court that they had "resolved the question themselves and no longer needed a response from the court." Over Brooks' objection, the court decided to answer the question anyway by reinstructing with an additional paragraph from CALCRIM No. 520 which states: "There may be more than one cause of death. An act causes death only if it is a substantial factor in causing the death. A substantial factor is more than a trivial or remote factor. However, it does not need to be the only factor that causes death."

Brooks contends that the court's additional instruction on causes of death was not responsive to the jury's questions and was therefore prejudicial error.

We agree that the court's answer was not responsive to the jury's question. In our view the jurors were not asking about substantial factors and intervening causes resulting in death. Nonetheless, Brooks has not convinced us that the instruction the court gave in response to the jury's question caused him any prejudice.

11

## DISPOSITION

The judgment is affirmed.

<u>NOT TO BE PUBLISHED</u>.

ROTHSCHILD, P. J.

We concur:


CHANEY, J.


MILLER, J.*

---

\*     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.