Filed 2/24/15  P. v. Thurwachter CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>       Plaintiff and Respondent,<br><br>     v.<br><br>MARK THURWACHTER,<br><br>       Defendant and Appellant. | B254688<br><br>(Los Angeles County<br> Super. Ct. No. NA091292) |

APPEAL from the judgment of the Superior Court of Los Angeles County. James B. Pierce, Judge.  Affirmed.

Valerie G. Wass, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Assistant Attorney General, Shawn McGahey Webb and Garett A. Gorlitsky, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \* \* \* \* \*

Defendant and appellant Mark Thurwachter was convicted by jury of first degree murder. The sole issue presented is whether substantial evidence supports the jury's finding the murder was in the first degree. We conclude the record contains substantial evidence the murder was willful, deliberate and premeditated, and therefore affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

We summarize only those facts material to the question of premeditation and deliberation.

In February 2012, defendant lived in a mobile home park in Long Beach, as did the victim, Marvin Williams. Defendant and Mr. Williams had been friends, but they had a disagreement about money sometime before 2010 and were no longer on good terms. Defendant repeatedly told friends and family that Mr. Williams had stolen $5,000 from him.

Patricia and Carl Young were two of the people to whom defendant regularly complained about Mr. Williams. The Youngs were a married couple who had been staying in the mobile home park for several months each year since 1996, and knew both defendant and Mr. Williams. During their visits from December 2010 through March 2011, and again in December 2011, the Youngs occupied a space next to defendant, so they would see him basically every day. They had known Mr. Williams since 1996. Mr. Williams was a handyman of sorts and had done odd jobs for the Youngs over the years.

Between December 2010 and March 2011, Patricia Young heard defendant make threats or complain about Mr. Williams at least two dozen times, including saying he was "going to blow Marvin's goddamned head off." When the Youngs came back to the mobile home park in December 2011, defendant angrily complained and made negative comments about Mr. Williams "every day." He told the Youngs he had taken Mr. Williams to court but that all of the witnesses "lied" and he therefore did not recover any money from Mr. Williams. By that point in time, defendant was claiming the amount Mr. Williams owed him was $25,000. Mrs. Young explained that when defendant

2

initially made the threats against Mr. Williams, he sounded aggravated and would yell, but by December 2011 he sounded "more to the point" and "determined."

Mrs. Young also recalled defendant saying he had a gun, a 45-caliber Taurus, as well as ammunition. She heard him talking about it on at least one occasion with her husband, who is a former police officer and knowledgeable about guns. However, Mrs. Young never saw defendant's gun.

Mr. Young recalled hearing defendant make threatening statements about Mr. Williams at least a half dozen times, including saying "I'm going to blow that mother-[f-----'s] head off. I hate that son-of-a-bitch. He stole my money." Defendant also complained that Mr. Williams was pestering him, throwing rocks at his mobile home and committing other acts of vandalism. Mr. Young never saw Mr. Williams do any of those things; he just heard defendant say Mr. Williams was doing them. On the day before the Youngs left the mobile home park the last time before the incident, Mr. Young saw defendant with a gun. Defendant told him he had purchased a 45-caliber handgun. Defendant showed it to Mr. Young, and then told him he was swearing him to "secrecy" and Mr. Young should not tell anybody that he had the gun.

Defendant also regularly complained to his brother Joel about Mr. Williams, claiming he stole money from him and that he was going to shoot him.

Some time at the end of 2011, Wesley Rumsey, another resident of the mobile home park, saw an altercation between defendant and Mr. Williams. They were about 50 feet away from his trailer, talking in loud voices. Defendant threw a punch at Mr. Williams but it just glanced off him. Mr. Williams laughed and said "Is that all you got, boy?" Defendant responded "I'm going to kill your ass." Mr. Rumsey spoke with Mr. Williams about the altercation, and believed Mr. Williams did not take defendant's threat seriously.

Around this same time, defendant approached another resident of the park named Vincent Mangielli. Defendant asked Mr. Mangielli if he knew anyone who would "rough . . . up" Mr. Williams "or words to that effect." Mr. Mangielli thought it was a very odd thing to say. Mr. Mangielli told Mr. Williams what defendant had said.

3

On February 1, 2012, Kimberly Clarke was inside her trailer with her boyfriend, Mr. Mangielli. They occupied the first space and saw the other residents coming and going all the time. Around 5:00 in the evening, she and Mr. Mangielli saw defendant drive into the park. It was just starting to get dark outside.

Mr. Mangielli left to go over to the community shower room to take a shower. On his way over, he saw defendant standing outside his trailer staring up at the sky. While Mr. Mangielli was showering, Ms. Clarke remained inside their trailer, preparing dinner. She had the front door open and heard what sounded like "crunching leaves." She thought it might be her cat, so she stepped outside the door and looked around. She saw defendant a few trailers down, walking away from his trailer "very slowly." Sometime later, perhaps 30 or 45 minutes, Mr. Mangielli had returned from taking a shower and they were eating dinner. They heard a "very loud noise" that Ms. Clarke believed was a gunshot.

Sharon Andrews was Mr. Williams's girlfriend and lived with him in his trailer. On the evening of February 1, 2012, she got home around 6:30. She and Mr. Williams were about to start dinner, when Mr. Williams went outside to lock up his truck. Ms. Andrews heard a noise, something like "metal against metal" but did not recognize what it was. Within a minute or so, she heard a loud bang. Ms. Andrews heard Mr. Williams yell out a curse and make some sort of choking noise. When she went outside, Mr. Williams was lying on the ground, bleeding.

The medical examiner determined Mr. Williams died from a single fatal gunshot wound to the chest. The bullet "perforated his right chest, perforated his right lung, then perforated the right side of the heart." Ammunition recovered from defendant's truck and trailer, and the bullet recovered from Mr. Williams's chest wound, established that the bullet used to kill Mr. Williams was a "hollow point" bullet, a type of bullet which folds back and expands upon impact, causing a larger "wound path."

Sometime in the early morning hours of February 2, defendant appeared at his brother Joel's house and asked to stay overnight. The next day, defendant told his brother he needed to leave town for awhile, or possibly leave the country. Defendant

4

asked his brother to get a list of things from his trailer for him. Joel told him he would not do so, and also told him that if he had done anything stupid, he should not contact him. Joel did not hear from defendant again until he was arrested. In late March 2012, defendant was arrested in Cleveland, Ohio.

Defendant was charged by information with one count of possession of a firearm by a felon (Pen. Code, § 29800, subd. (a)(1); count 1), and one count of first degree murder (§ 187, subd. (a); count 2). It was also specially alleged as to count 2 that defendant personally used a firearm and personally discharged a firearm causing great bodily injury in the commission of the offense (§ 12022.53, subds. (b)-(d)). It was further alleged defendant had suffered two prior serious felonies (§ 273.5). Defendant pled not guilty and denied the special allegations.

During trial, defendant withdrew his not guilty plea on count 1 and entered a plea of no contest. The jury convicted defendant of first degree murder on count 2 and found the special firearm allegations true.

The court sentenced defendant to a 25-years-to-life term on the murder charge, plus a consecutive 25-years-to-life term for the firearm use enhancement. The court imposed a consecutive 8-month term on count 1, awarded defendant 644 days of custody credits and imposed various fines and fees.

This appeal followed.

## DISCUSSION

Defendant contends there is insufficient evidence the killing of Mr. Williams was willful, deliberate and premeditated and that his conviction on count 2 should therefore be reduced to second degree murder. We disagree.

"In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.) "The standard of review is the same in cases in which the prosecution relies mainly on circumstantial

5

evidence." (*Ibid*.) "Reversal on this ground is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331; accord, *People v. Manriquez* (2005) 37 Cal.4th 547, 577 (*Manriquez*).)

In *People v. Anderson* (1968) 70 Cal.2d 15, 26-27 (*Anderson*), the Supreme Court "identified three types of evidence—evidence of planning activity, preexisting motive, and manner of killing—that assist in reviewing the sufficiency of the evidence supporting findings of premeditation and deliberation." (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1069.) However, the court made clear "that ' "*Anderson* did not purport to establish an exhaustive list that would exclude all other types and combinations of evidence that could support a finding of premeditation and deliberation." [Citations.]' [Citation.]" (*Mendoza,* at p. 1069; accord, *People v. Perez* (1992) 2 Cal.4th 1117, 1125, and *Manriquez*, *supra*, 37 Cal.4th at p. 577 [" '*Anderson* was simply intended to guide an appellate court's assessment whether the evidence supports an inference that the killing occurred as the result of preexisting reflection rather than unconsidered or rash impulse' "].)

Defendant does not challenge the evidence supporting the jury's determination he killed Mr. Williams. Instead, he argues there is a lack of credible evidence the killing was in the first degree. Defendant concedes there was evidence of motive, but urges the evidence is otherwise insufficient as to planning and manner of killing because: (1) there was no eyewitness to the shooting; (2) the "metal against metal" noise heard by Ms. Andrews could have been the result of a provoking incident between Mr. Williams and defendant before the gun was fired; (3) the threats by defendant were not made in close proximity to the shooting; (4) Mr. Williams was shot only once and not multiple times to ensure his death; (5) Mr. Williams was shot in the early evening when other residents could have been around as witnesses; and (6) even Mr. Williams did not take defendant's threats seriously. We are not persuaded.

6

The record contains ample, credible evidence of all three *Anderson* factors, substantial evidence upon which the jury could have reasonably rested its first degree murder finding.

As for planning and deliberation, defendant's numerous threats to kill Mr. Williams were circumstantial evidence of a preconceived plan to kill Mr. Williams when the time was right. A month before the shooting, defendant purchased a gun, showed it to Mr. Young and swore him to "secrecy" about its existence. On the night of the shooting, defendant was standing outside his trailer staring up into the sky, and as it grew dark, defendant started to walk in a slow and deliberate manner away from his trailer. The shooting occurred within 30 to 45 minutes thereafter, raising a reasonable inference defendant walked to Mr. Williams's residence, with a loaded firearm, waited for his opportunity to shoot him, and did so with precision once Mr. Williams stepped outside to lock up his truck.

Such evidence supports an inference of the requisite degree of reflection, planning and intent to kill, and belies defendant's contention he was merely in possession of a firearm but engaged in no other conduct indicative of premeditation. (See *People v. Lee* (2011) 51 Cal.4th 620, 636 [fact the defendant "brought a loaded handgun with him . . . indicat[ed] he had considered the possibility of a violent encounter"]; *People v. Young* (2005) 34 Cal.4th 1149, 1183 [the "jury could infer that defendant 'considered the possibility of murder in advance' and intended to kill" based on evidence the defendant executed his planned entry into the victim's home with a loaded gun in hand]; *People v. Steele* (2002) 27 Cal.4th 1230, 1250 [evidence the defendant took a knife into the victim's home raises reasonable inference " 'he considered the possibility of homicide from the outset' "]; *People v. Martinez* (1987) 193 Cal.App.3d 364, 371 [evidence of threats of harm by the defendant against his girlfriend occurring over a significant period of time supported the inference the defendant "previously formed the intent to kill" his girlfriend if he caught her with another man and that the eventual killing was "in conformity with that preconceived plan"].)

7

As for motive, there was overwhelming evidence of defendant's long-simmering antipathy for Mr. Williams as a consequence of losing his lawsuit against Mr. Williams. A month before the shooting, defendant also physically assaulted Mr. Williams and attempted to find someone to "rough" him up. As defendant concedes, there was strong evidence of motive.

As for the manner of killing, the testimony of the medical examiner and the firearms expert established that Mr. Williams was shot at relatively close range, in the heart, with a hollow-point bullet designed to expand upon impact and cause a wide wound path and greater injury than a standard bullet. And, despite defendant's argument to the contrary, there was no credible evidence -- only defendant's speculation -- of a pre-shooting altercation that precipitated the shooting. Ms. Andrews, who was inside Mr. Williams's trailer at the time the fatal shot was fired just outside, did not hear any argument or altercation before the sound of the gunshot. She only reported a "metal against metal" sound, then the loud bang, and Mr. Williams crying out in pain, cursing and making a choking noise. (*People v. Thompson* (2010) 49 Cal.4th 79, 114-115 ["a close-range shooting without any provocation or evidence of a struggle, reasonably supports an inference of premeditation and deliberation"]; *People v. Koontz* (2002) 27 Cal.4th 1041, 1081-1082 [manner of killing in which the defendant fired a shot, at close range, at a vital area of the victim's body, indicative of a deliberate intention to kill].)

## DISPOSITION

The judgment of conviction is affirmed.


GRIMES, J.

We concur:

BIGELOW, P. J.



RUBIN, J.

8